**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **IN RE VERISOURCE SERVICES, INC., DATA BREACH LITIGATION** | Case No. 4:24-CV-03492 **DEMAND FOR JURY TRIAL** |

<u>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**</u>

Plaintiffs Payson Clarke, Stacey Sanchez, Scott Wagner, Aaron Williams, Frank Fazio, Sarah White, Nankumar Bacchus, Jassir Bueno, Alexander Farley, Kelvin Gill, Kimberly Touchton, Marah West, Bruce Knights, Dmario Davis, Richard Almeda, Herbert Diggs, Annette Falcon, Joyce Popoola, Tanya Holcomb, Shinika Hendricks, and Andrew Wheaton (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Second Amended Consolidated Class Action Complaint ("Complaint") against Defendants VeriSource Services, Inc. ("VSI"), Planned Administrators Inc. ("PAI"), and Southwest Water Company ("SWC") (collectively, "Defendants"), alleging as follows, based upon personal knowledge and investigation of counsel.

## I.  INTRODUCTION

1.     This class action arises from Defendants' failure to properly secure and safeguard Plaintiffs' and Class Members' confidential protected health information

("PHI")[1] and personally identifiable information ("PII")[2] (collectively, "Private Information"), which as a result, was **stolen** from VSI's systems and is now in the hands of cybercriminals.

2.    In or around February 2024, a ransomware group known as "BlackSuit" penetrated VSI's inadequately secured network environment and **exfiltrated** Plaintiffs' and Class Members' sensitive, confidential, and unsecured Private Information stored therein, including their full names, dates of birth, Social Security numbers, and health information, causing widespread injuries and damages to Plaintiffs and Class Members ("Data Breach" or "Breach").

3.    VSI provides third-party employment and benefit enrollment, administration, and data management services to consumers in connection with employer and self-funded plans.[3]

4.    SWC and PAI utilized VSI's benefit administration and data management

---

[1] The Department of Health and Human Services ("HHS") defines "protected health information" as "individually identifiable health information . . . that is: (i) Transmitted by electronic media; (ii) Maintained in electronic media; or (iii) Transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103. "Health information" means "any information, including genetic information, whether oral or recorded in any form or medium, that: (1) Is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." *Id.*
[2] The Federal Trade Commission ("FTC") defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth. . . .." 17 C.F.R. § 248.201(b)(8).
[3] *See VSI Services*, VERISOURCE SERVICES, INC., http://verisource.com/Services/Index/3 (last visited April 1, 2025).

services and the data they provided VSI was accessed and exfiltrated as a result of the Data Breach.

5. Plaintiffs and Class Members are current or former employees, or dependents of current or former employees, of companies that outsourced benefit administration and data management functions to VSI.

6. As a condition of receiving VSI's services, Plaintiffs and Class Members were required to entrust their sensitive, non-public Private Information to one or more Defendants and by extension to VSI.

7. VSI could not perform its regular business activities or generate revenue without collecting and maintaining Plaintiffs' and Class Members' Private Information. Upon information and belief, VSI retains the Private Information it collects for many years, even after its relationships with Plaintiffs and Class Members end.

8. Businesses that handle consumers' Private Information, like VSI, owe the individuals to whom the information relates a duty to adopt reasonable measures to protect it from disclosure and theft by unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory, and common law, industry standards, representations made to Plaintiffs and Class Members, and because it is foreseeable that hackers with nefarious intentions will target the Private Information and use it to harm the affected individuals.

9. Similarly, businesses that collect consumers' Private Information—such as SWC and PAI—and provide this information to vendors and/or independent contractors like VSI—owe the individuals to whom the information relates a duty to ensure that the

vendor and/or independent contractor utilizes and adopts reasonable measures to protect the Private Information from disclosure and theft and to keep it safe and confidential. This duty arises under contract, statutory, and common law, industry standards, representations made to Plaintiffs and Class Members, and because it is foreseeable that hackers with nefarious intentions will target the Private Information and use it to harm the affected individuals.

10.     Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to VSI, and thus, VSI knew that failing to take reasonable steps to secure the Private Information left it in a dangerous condition.

11.     Similarly, the possibility of a cyberattack and the potential for improper disclosure of Plaintiffs' and Class Members' Private Information if inadequate data security was used by a vendor and/or independent contractor was a known risk to SWC and PAI. Thus, SWC and PAI knew that if they failed to select a vendor and/or independent contractor with adequate data security and audit and verify the integrity of their vendor's data security practices that Plaintiffs' and the Class's Private Information would be left in a dangerous and vulnerable condition.

12.     The Data Breach, which VSI failed to detect until cybercriminals had already **copied and stolen** Plaintiffs' and Class Members' Private Information, is the direct result of VSI's failure to implement basic data security measures or oversight over consumers' data in its custody and control. Had VSI implemented reasonable cybersecurity measures— including adequate safeguards for initial access, encryption, or redaction of personal data

elements, and sufficient logging, monitoring, and alerting tools to detect unauthorized activity—criminals would not have been able to hack into VSI's servers, perform reconnaissance necessary to locate Plaintiffs' and Class Members' Private Information, and then exfiltrate that data before being detected.

13.    Furthermore, had SWC and PAI ensured VSI implemented reasonable cybersecurity measures **prior** to utilizing VSI's services—including by ensuring that VSI implemented adequate safeguards for initial access, encryption or redaction of personal data elements, and sufficient logging, monitoring, and alerting tools to detect unauthorized activity—Plaintiffs and Class Members would not have suffered the harm alleged herein.

14.    VSI failed to adequately protect Plaintiffs' and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive data when it was maintained on VSI's internet-accessible network without adequate safeguards against unauthorized access and exfiltration. This unencrypted, unredacted Private Information was compromised due to VSI's negligent acts and omissions and utter failure to protect it.

15.    Similarly, SWC and PAI failed to adequately protect Plaintiffs' and Class Members' Private Information by failing to ensure the vendors and/or independent contractors it utilized, such as VSI, implemented industry standard data security procedures, practices, and protocols to protect Plaintiffs' and Class Members Private Information from hackers.

16.    VSI breached its duties and obligations by failing in one or more of the following ways: (a) to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (b) to design, implement, and maintain reasonable

data retention policies; (c) to adequately train or oversee its employees regarding data security; (d) to comply with industry standard data security practices; (e) to warn Plaintiffs and Class Members and/or their agents of VSI's inadequate data security practices; (f) to encrypt or adequately encrypt the Private Information that was stored on VSI's network server; (g) to recognize or detect that its network systems repository had been compromised and accessed, or the extent of information compromised, in a timely manner to mitigate the harm; (h) to utilize widely available software able to detect and prevent this type of attack; and (i) to otherwise adequately secure the Private Information using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

17.     SWC and PAI breached their duties and obligations by: (a) failing to ensure VSI designed, implemented, monitored, and maintained reasonable network safeguards against foreseeable threats; (b) failing to ensure VSI designed, implemented, and maintained reasonable data retention policies; (c) failing to ensure VSI adequately trained or oversaw its employees regarding data security; (d) failing to ensure VSI complied with industry standard data security practices; (e) failing to warn Plaintiffs and Class Members of VSI's inadequate data security practices; (f) failing to ensure VSI encrypted or adequately encrypted the Private Information that was stored on VSI's network server; (g) failing to ensure VSI had systems or processes in place to recognize or detect that VSI's network had been compromised and accessed; (h) failing to ensure VSI utilized widely available software able to detect and prevent this type of attack; and (i) failing to ensure VSI otherwise adequately secured the Private Information of Plaintiffs and the Class using

6

reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

18.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality and security of their Private Information. In providing their Private Information to one or more Defendants, Plaintiffs and Class Members reasonably expected that Defendants would keep their Private Information confidential and secure, use this information for only legitimate business purposes, and disclose it only as authorized. Defendants failed to do so, resulting in the unauthorized disclosure and exfiltration of Plaintiffs' and Class Members' Private Information in the Data Breach.

19.    Hackers targeted and obtained Plaintiffs' and Class Members' Private Information from VSI because of the data's value in exploiting and stealing Plaintiffs' and Class Members' identities. As a direct and proximate result of VSI's inadequate data security and PAI's and SWC's failure to audit or verify the integrity of VSI's data security practices, and Defendants' breach of their duties to handle Private Information with reasonable care, Plaintiffs' and Class Members' Private Information was **accessed and acquired** by cybercriminals and exposed to an untold number of unauthorized individuals. The present and continuing risk to Plaintiffs and Class Members as victims of the Data Breach will remain for their respective lifetimes.

20.    The harm resulting from a cyberattack like this Data Breach manifests in numerous ways including identity theft and financial fraud. The exposure of an individual's Private Information due to a data breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the

population, potentially for the rest of his or her life. Indeed, given that the compromised Private Information includes names, dates of birth, Social Security numbers, and health information, which is immutable and cannot be changed, this risk will persist for the remainder of their lives. Mitigating that risk, to the extent even possible, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, medical information, and email accounts, and take several additional prophylactic measures. Through no fault of their own, Plaintiffs and Class Members will be forced to allocate time to these tasks for years, if not their lifetimes, due to the Data Breach.

21.   To make matters worse, although VSI confirmed the Data Breach's occurrence by February 28, 2024, Defendants waited an additional six (6) months before beginning to notify Plaintiffs and Class Members their Private Information had been compromised, while providing conflicting information about the Data Breach in notices to government agencies.

22.   Further, upon information and belief, not all entities impacted by VSI's data breach have issued direct notice of the Data Breach to the victims. Thus, the full scope of the Data Breach is still unknown.

23.   Defendants' delayed and vague reporting caused Plaintiffs and Class Members to incur additional damages by diminishing their ability to timely and thoroughly address harms from the Data Breach, like by monitoring their account statements and obtaining identity theft protection services in the Data Breach's aftermath.

24.   As a result of the Data Breach, Plaintiffs and Class Members suffered

concrete injuries in fact including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of the value of their Private Information; (g) loss of privacy; (h) emotional distress including anxiety and stress in with dealing with the Data Breach; and (i) the continued risk to their sensitive Private Information, which remains in Defendants' possession and is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect the PII they collect and maintain.

25. To recover for these harms, Plaintiffs, on behalf of themselves and the Class as defined herein, bring claims for negligence/negligence *per se*, breach of implied contract, breach of third-party beneficiary contract, unjust enrichment, declaratory/injunctive relief, and negligent hiring and supervision.

26. Plaintiffs and Class Members seek compensatory, nominal, statutory, and punitive damages, declaratory judgment, and injunctive relief requiring Defendants to (a) disclose, expeditiously, the full nature of the Data Breach and the types of Private Information exposed; (b) implement improved data security practices to reasonably guard against future breaches of Private Information; and (c) provide, at Defendants' own expense, all impacted Data Breach victims with lifetime identity theft protection services.

## II. PARTIES

*Plaintiffs*

27.     Plaintiff **Payson Clarke** is a citizen and resident of Richmond, Texas.

28.     Plaintiff **Stacey Sanchez** is a citizen and resident of Richmond, Texas.

29.     Plaintiff **Scott Wagner** is a citizen and resident of Travis County, Texas.

30.     Plaintiff **Aaron Williams** is a citizen and resident of Minette, Alabama.

31.     Plaintiff **Frank Fazio** is a citizen and resident of Phoenix, Arizona.

32.     Plaintiff **Sarah White** is a citizen and resident of Kansas City, Missouri.

33.     Plaintiff **Nankumar Bacchus** is a citizen and resident of Freemont, California.

34.     Plaintiff **Jassir Bueno** is a citizen and resident of Port Hueneme, California.

35.     Plaintiff **Alexander Farley** is a citizen and resident of Sherman Oaks, California.

36.     Plaintiff **Kelvin Gill** is a citizen and resident of Montclair, California.

37.     Plaintiff **Kimberly Touchton** is a citizen and resident of Yadkinville, North Carolina.

38.     Plaintiff **Marah West** is a citizen and resident of Florida City, Florida.

39.     Plaintiff **Bruce Knights** is a citizen and resident of Chicago, Illinois.

40.     Plaintiff **Dmario Davis** is a citizen and resident of Indianapolis, Indiana.

41.     Plaintiff **Richard Almeda** is a citizen and resident of Rosehill, California.

42.     Plaintiff **Herbert Diggs** is a citizen and resident of Fort Smith, Arkansas.

43.     Plaintiff **Joyce Popoola** is a citizen and resident of Indianapolis, Indiana.

10

44.    Plaintiff **Annette Falcon** is a citizen and resident of Louisville, Kentucky.

45.    Plaintiff **Tanya Holcomb** is a citizen and resident of White Hall, Arkansas.

46.    Plaintiff **Shinika Hendricks** is a citizen and resident of Tupelo, Missouri.

47.    Plaintiff **Andrew Wheaton** is a citizen and resident of Oklahoma City, Oklahoma.

48.    Plaintiffs are current or former employees, or dependents of current or former employees, of companies that contracted with VSI for third-party benefit administration and data management services prior to February 27, 2024; thus, Plaintiffs were and are VSI's ultimate customers. As a condition of and in exchange for their receipt of VSI's services, each Plaintiff was required to and did provide his or her Private Information to VSI.

49.    Each Plaintiff received correspondence from VSI dated August 20, 2024, titled, "Notice of Data Security Incident," informing them that his or her Private Information "was acquired without authorization" in the Data Breach.

***Defendants***

50.    Defendant **VeriSource Services Inc.** is a Texas domestic for-profit corporation with a principal office address located at 7600 West Tidwell, Suite 700, Houston, TX 77040. VSI's registered agent is Kathleen J. Lee, who is located at the same address.

51.    Defendant **Southwest Water Company** is organized under the laws of Delaware and is located at 624 S. Grand Ave., Suite 2900, Los Angeles, CA 90017. SWC's registered agent is Capitol Corporate Services, Inc., which is located at 1501 South Mopac

Expressway, Suite 220, Austin, TX 78746. SWC is a water and wastewater utility company servicing Alabama, California, Florida, Louisiana, South Carolina, Texas, and Oregon.[4] SWC conducts substantial business in the State of Texas and utilized VSI's services during the relevant time period.

52.    Defendant **Planned Administrators Inc.** is a South Carolina for-profit corporation with a principal office address located at 17 Technology Circle, Suite E2AG, Columbia, SC 29203. PAI's registered agent for service of process is the Commissioner of Insurance located at 333 Guadalupe St., Austin, TX 78701. PAI is wholly owned by BlueCross BlueShield of South Carolina and is a nationally licensed third-party administrator. PAI conducts substantial business in the State of Texas and utilized VSI's services.

### III.    JURISDICTION AND VENUE

53.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different than any Defendant.

54.    This Court has personal jurisdiction over VSI because it is a Texas citizen with its principal place of business in Texas. VSI regularly conducts business in Texas, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from

---

[4] SWWC, https://www.swwc.com/ (last visited April 1, 2025).

Texas.

55.    This Court has personal jurisdiction over SWC because it regularly conducts business in Texas, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from Texas.

56.    This Court has personal jurisdiction over PAI because it regularly conducts business in Texas, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from Texas.

57.    Defendants have purposely availed themselves of the rights and benefits of the state of Texas by engaging in activities including (a) directly and/or through their affiliates and agents providing services in this District; (b) conducting substantial business in this District; (c) having a registered agent to accept service of process in the state of Texas; and/or (d) engaging in other persistent courses of conduct and/or deriving revenue from services provided in Texas and in this District.

58.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants reside within this District and/or have purposefully engaged in activities, including transacting business, in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events and/or omissions giving rise to the claims herein emanated from within this District, including the Data Breach at issue.

## IV.    GENERAL FACTUAL ALLEGATIONS

### A.    Defendants Collect and Maintain Private Information as Part of their Business for Profit.

59.    According to its website, VSI is "a leading provider of employee benefits

13

administration services," including outsourced data management, direct billing, human resources, and dependent verification functions.[5]

60.    VSI is commonly contracted by employer-clients to provide administration, data management, and related services to plan beneficiary customers across the nation,[6] including Plaintiffs and Class Members.

61.    VSI's clients include PAI and SWC among others.

62.    Regarding its benefit data management services, VSI's website states, "VSI's proprietary technology provides innovative Client data warehousing solutions that consolidate employee benefit data into a single database. Our custom solutions provide a web portal for HR administrators to access a wealth of benefit data along with an online Benefit Briefcase for employees."[7]

63.    VSI's website additionally warrants as follows:

> **Data Security**
> VSI is a human resource benefit data administration services company dedicated to, and sophisticated about, privacy, data protection, and information security policy. We take proactive and intentional steps to protect our client's data, and build a secure benefits administration platform. . .. VSI is commited [sic] to the security and integrity of our Client's information.[8]

---

[5] *See About VSI*, VERISOURCE SERVICES, INC., http://verisource.com/Home/About/2 (last visited April 1, 2025).

[6] *See Benefit Data Management*, VERISOURCE SERVICES, INC., http://verisource.com/Services/EligibleDataManagementBySubmenuId?submenuId=1 (last visited April 1, 2025).

[7] *Id.*

[8] *Id.*

64.　VSI's employer-customers, such as SWC, contract VSI to provide employee self-service benefit enrollment services through VSI's integrated and proprietary "Benefit Data Management System."[9]

65.　PAI uses VSI to allow companies it services to access their employees' health benefit information through VSI's Benefit Data Manager.[10]

66.　In other words, VSI's business is collecting and maintaining consumers' data, including Plaintiffs' and Class Members' Private Information.

67.　Considering VSI's business is collecting and maintaining PII, SWC and PAI should have taken special care in selecting and auditing VSI to ensure that it had adequate data security protocols in place to protect PII.

68.　VSI derived substantial economic benefits from collecting and using Plaintiffs' and Class Members' Private Information.

69.　Without the required submission of Private Information, VSI could not perform its operations, furnish the services it provides, or receive payment for those services.

70.　As a condition of and in exchange for receiving benefits, insurances and related services, Plaintiffs and Class Members were required to entrust their highly sensitive Private Information to VSI, either directly or through their employers who contracted with VSI for benefit administration and data management services.

---

[9] *See Employee Enrollment Solutions*, VERISOURCE SERVICES, INC., http://verisource.com/Services/AutomatedEnrollmentBySubmenuId?submenuId=2 (last visited April 1, 2025).

[10] *See* PAI's Benefit Data Mager Portal, available at https://staffmark.verisourcesvc.com/

15

71.     The data Defendants collect and maintain in the ordinary course of business includes full names, dates of birth, Social Security numbers, health information, and other sensitive data.

72.     At all relevant times, VSI knew it was storing and using its network to store and transmit valuable, sensitive Private Information and that as a result, its systems would be attractive targets for cybercriminals.

73.     VSI also knew that any breach of its information technology network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the hundreds of thousands of individuals whose Private Information was compromised, as well as intrusion into their private and sensitive personal matters.

74.     In exchange for receiving Plaintiffs' and Class Members' Private Information, VSI promised to safeguard the sensitive and confidential data, to use it only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

75.     Upon information and belief, VSI made promises and representations that the Private Information collected from them as a condition of obtaining services from VSI, directly and indirectly, would be kept safe and confidential, that the information's privacy would be maintained, and that VSI would delete any sensitive information after it was no longer required to maintain it.  According to information and belief, VSI made promises in writing, through privacy statements and related representations in documents provided to Plaintiffs and Class Members and/or their employers in connection with their benefit plans,

16

to keep Plaintiffs' and Class Members' Private Information confidential through reasonable and legally compliant data security measures.

76.     Based on the foregoing representations and warranties, and to obtain benefit administration services and data management from VSI, directly or indirectly, Plaintiffs and Class Members provided their Private Information to VSI with the reasonable expectation and mutual understanding that VSI would comply with its obligations to keep such information confidential and protected. Consumers, in general, demand security for their Private Information, especially when Social Security numbers and health data are involved.

77.     The data VSI held in its network systems at the time of the Data Breach included the unencrypted Private Information of Plaintiffs and Class Members.

**B.     VSI Owed Duties to Adopt Reasonable Data Security Measures for Private Information it Collected and Maintained.**

78.     As part of its business, VSI collects millions of individuals' Private Information, including that of Plaintiffs and Class Members, storing the data in its network server(s).

79.     VSI had and continues to have duties to adopt reasonable measures to keep Plaintiffs' and Class Members' Private Information confidential and protected from disclosure to unauthorized third parties, and to audit, monitor, and verify the integrity of its network server(s) where Private Information is stored.

80.     VSI had and has obligations stemming from the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45, the Health Insurance Portability and Accountability Act

17

("HIPAA"), common law, contract, and industry standards, to keep Plaintiffs' and Class Members' Private Information confidential and protected from unauthorized disclosure.

81.  Additionally, by obtaining, using, and benefitting from Plaintiffs' and Class Members' Private Information as a data management provider, VSI assumed legal and equitable duties and knew or should have known it was responsible for protecting that Private Information from unauthorized access and disclosure.

82.  VSI also owed a duty to protect Plaintiffs and Class Members from the harm that insufficient data security and consequential exposure of their Private Information would cause, because such harm was foreseeable and reasonably preventable.

83.  VSI knew it was storing valuable, sensitive Private Information in its network server(s) and that as a result, those systems would be an attractive target for cybercriminals.

84.  VSI also knew that any breach of its systems and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the thousands of individuals whose Private Information was compromised, as well as intrusion into their private and sensitive personal financial and health matters.

85.  Indeed, VSI touts itself as a "human resource benefit data administration services company dedicated to, and sophisticated about, privacy, data protection, and information security policy," that is "commited [sic] to the security and integrity of [its]

18

Client's information"[11]—demonstrating its knowledge of data security's importance and value.

86.    VSI's duty to protect Plaintiffs and Class Members from the foreseeable risk of injury that inadequate data protection and unauthorized exposure of their Private Information would cause obligated VSI to implement reasonable practices to keep Plaintiffs' and Class Members' sensitive Private Information confidential and securely maintained through reasonable, industry-standard, and legally compliant measures.

87.    Additionally, upon information and belief, all benefit administration, and data management contracts VSI entered into with its employer-clients require VSI to implement and maintain reasonable, adequate, and legally compliant cybersecurity measures to protect its clients' employees' Private Information against unauthorized disclosure and exfiltration.

88.    Plaintiffs and Class Members, as employees and/or their dependents and plan participants that provided their Private Information to VSI pursuant to its agreements with their employers, were and are the intended beneficiaries of VSI's contractual obligation of reasonable, industry standard, and legally compliant data security for its clients' employees Private Information.

---

[11]    *See Benefit Data Management*, VERISOURCE SERVICES, INC., http://verisource.com/Services/EligibleDataManagementBySubmenuId?submenuId=1 (last visited April 1, 2025).

89.     VSI's contractual obligations to safeguard Plaintiffs' and Class Members' Private Information are an additional source of VSI's duty to protect Plaintiffs' and Class Members' Private Information in its custody and control.

90.     VSI owed the foregoing duties to protect Private Information maintained on its network systems from unauthorized disclosure and had the practical ability to fulfill those duties—yet failed to do so.

**C.      VSI Failed to Adequately Safeguard Plaintiffs' and Class Member's Private Information, Resulting in a Massive and Preventable Data Breach.**

91.     On or about August 20, 2024, VSI began sending Plaintiffs and other Data Breach victims correspondence titled "Notice of Data Security Incident" ("Notice Letters").

92.     The Notice Letters generally inform Plaintiffs and Class Members as follows:

> We are writing to inform you about a recent data security incident experienced by VeriSource Services, Inc. ("VSI") that may have involved your personal information. VSI provides employee administrative and benefit data management services for companies. You may be receiving this letter as an employee of a company that uses VSI's services or because that employee designated you as their beneficiary or dependent. . .. .
>
> **What happened?** On February 28, 2024, VSI became aware of unusual activity that disrupted access to certain systems. Upon discovery, VSI immediately took steps to secure its network and engaged a leading, independent digital forensics and incident response firm to investigate what happened and whether any sensitive data may have been impacted. The investigation subsequently revealed certain personal information was acquired without authorization by an unknown actor on or about February 27, 2024. VSI undertook a comprehensive review of the potentially impacted data to identify the individuals and information involved, which

20

concluded on August 12, 2024. . ...

**What information Was Involved?** The information that was potentially impacted during this incident may have included your name, as well as your Social Security number.

93.    Omitted from the Notice Letters were the details of the root cause of the Data Breach, the identity of the perpetrator of the Data Breach (BlackSuit), the vulnerabilities exploited, when the Data Breach began and ended, and the remedial measures undertaken to ensure such a data breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

94.    Additionally, while the Notice Letters state VSI purportedly undertook a comprehensive review of the impacted data that concluded on August 12, 2024, its subsequent consumer notice to California's attorney general, dated November 6, 2024, states VSI's review of impacted data concluded October 31, 2024.[12]

95.    That VSI errantly determined that its investigation into the Data Breach was done in August—already six (6) months after the Data Breach happened—before needing an additional two (2) months to complete the investigation evidences its deficient digital forensic competence. Upon information and belief, had VSI implemented standard and reasonable digital forensic measures such as timestamping, intrusion detection systems,

---

[12] *Ltr. to Cal. Att'y Gen. re: Notice of Data Security Incident / Breach*, VERISOURCE SERVICES, INC. (November 6, 2024), available at: https://oag.ca.gov/system/files/VeriSource%20-%20Consumer%20Notification%20Letter%20-%20%28General%20-%20Second%20Mailing%20v.2%29%20v2___Static_Proof_R1%20%281%29.pdf.

and logging aspects, it would be prepared for a forensic investigation of compromised information and would not need eight (8) months (at least) to identify the information involved in the Data Breach. These failures exacerbated Plaintiffs' and Class Members' damages, including actual damages in the form of lost opportunity costs, among others, by delaying and obfuscating VSI's notice of the Data Breach and depriving Plaintiffs and Class Members of crucial time to mitigate and address it in a timely manner, like by putting credit freezes on their accounts or obtaining identity theft protection services.

96.    Moreover, VSI reported to state agencies and Data Breach victims that only PII, like names and Social Security numbers, were accessed and exfiltrated in the Data Breach. However, VSI reported the Data Breach to HHS pursuant to the HIPAA regulation requiring such notification "following the discovery of a breach of unsecured protected health information." 45 C.F.R. § 164.408(a). This indicates that unencrypted PHI of Plaintiffs and Class Members was or may have been involved in the Data Breach, in addition to the compromise of PII that VSI reported to Plaintiffs and Class Members.

97.    Thus, VSI's purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of the Data Breach's critical facts, like the status of VSI's investigation or the nature of the Private Information involved, with any degree of specificity or uniformity. Without these details, Plaintiffs,' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

98.    To make matters worse, VSI waited at least six (6) months after the Data Breach occurred to begin notifying Plaintiffs and Class Members that the sensitive Private Information they entrusted to VSI is now in criminal hackers' possession. This

22

unreasonable and unexplained delay deprived Plaintiffs and Class Members of crucial time to address and mitigate the heightened risk of identity theft and other harms resulting from the Data Breach.

99.    Plaintiffs' and Class Members' Private Information was targeted, accessed, and stolen by BlackSuit in the Data Breach.

100.    BlackSuit is a notorious criminal ransomware group that poses a serious threat to the victims of the Data Breach.

101.    "BlackSuit is a private ransomware operation with no known affiliates and does not operate as a ransomware-as-a-service (RaaS). It is an active and widespread threat…[.]"[13]

102.    "Like many threat actors, BlackSuit uses phishing emails that contain malicious attachments or links that will start the infection process when opened. The infected attachments often use macros to execute the code, and the links may lead to malicious websites that conduct drive-by download attacks."[14]

103.    BlackSuit "also uses malvertising to redirect users to their attack sites. Remote desktop protocol (RDP) is the second most common vector for initial access. Approximately 13.3% of BlackSuit attacks start here, often with stolen credentials that BlackSuit purchased from initial access brokers. BlackSuit will also exploit public-facing

[13] Christine Barry, *BlackSuit Ransomware: 8 Years, 6 Names, 1 Cybercrime Syndicate*, BARRACUDA (Oct. 29, 2024) https://blog.barracuda.com/2024/10/29/blacksuit-ransomware--8-years--6-names--1-cybercrime-syndicate (last visited April 1, 2025).
[14] *Id.*

applications that are misconfigured, unpatched, or otherwise vulnerable to attack."[15]

104. In a Joint Cybersecurity Advisory issued by the Federal Bureau of Investigation and the Cybersecurity and Infrastructure Security Agency, the agencies warned, "BlackSuit conducts data exfiltration and extortion prior to encryption and then publishes victim data to a leak site if a ransom is not paid. Phishing emails are among the most successful vectors for initial access by BlackSuit threat actors. After gaining access to victims' networks, BlackSuit actors disable antivirus software and exfiltrate large amounts of data before ultimately deploying the ransomware and encrypting the systems."[16]

105. Thus, the threat of harm has already materialized. BlackSuit has stolen Plaintiffs' and the Class's Private Information and will publish their Private Information on the dark web—if BlackSuit has not already done so.

106. VSI's insufficient data security caused and allowed criminals to target and take files containing Plaintiffs' and Class Members' inadequately protected, unencrypted Private Information from VSI's network server, and unreasonably delayed Plaintiffs' and Class Members' notice by months.

107. As the Data Breach and its timeline evidences, VSI did not use reasonable data security measures appropriate to the nature of the sensitive Private Information collected from Plaintiffs and Class Members and maintained on VSI's network server(s),

---

[15] *Id.*

[16] *#StopRansomware: Blacksuit (Royal) Ransomware*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Rev. Aug. 7, 2024), available at: https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-061a.

such as encrypting the information, deleting the data from VSI's server when it was no longer needed, requiring sufficient verification such as multi-factor authentication for accounts with access to servers storing Private Information, training employees about cybersecurity and attempts to gain unauthorized access, investigating and addressing vulnerabilities in its data security practices, and/or implementing the necessary safeguards to enable VSI to identify malicious activity and curtail it when it happens. These failures allowed and caused cybercriminals to target VSI's network systems and carry out the Data Breach.

108.   VSI could and should have prevented this Data Breach by ensuring its files and servers containing Plaintiffs' and Class Members' Private Information were properly secured, sanitized, and encrypted and by using appropriate clearinghouse practices to purge consumer data that it was no longer required to maintain, but failed to do so.

109.   VSI could and should have properly monitored its network for unauthorized access and unusual activity, including the downloading of large amounts of sensitive personal information from its network.

110.   Additionally, VSI could have prevented the Data Breach by examining, testing, and updating its cybersecurity practices to ensure vulnerabilities were identified and addressed and reasonable safeguards were continuously maintained, but failed to do so.

111.   VSI could and should have implemented the following measures to prevent and detect the Data Breach, as recommended by the Microsoft Threat Protection Intelligence Team, but failed to do so:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events.[17]

112. VSI's tortious conduct and breach of contractual obligations, as detailed in herein, are evidenced by its failure to identify the scope of information involved and/or individuals impacted by the Data Breach until months after cybercriminals breached its network and accessed Plaintiffs' and Class Members' Private Information stored therein—meaning VSI had no effective means in place to ensure that cyberattacks were detected, prevented, or timely investigated.

---

[17] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT THREAT INTELLIGENCE, (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster (last visited April 1, 2025).

113.   VSI's negligence in safeguarding Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data.

**D.   PAI and SWC Negligently Utilized VSI's Services.**

114.   PAI and SWC were negligent and failed to confirm when retaining VSI's services that Plaintiffs' and Class Members' Private Information would be protected from unauthorized access, that VSI maintained adequate data security procedures, practices, infrastructure, and protocols, and that Plaintiffs' and the Class's Private Information would not be subject to unauthorized access and exfiltration.

115.   PAI and SWC owed, and continue to owe, duties of care to Plaintiffs and Class Members to: (a) exercise reasonable care to secure and protect the Private Information in its possession and the Private Information in the possession of any entity it hired to provide services—such as VSI—from unauthorized access; (b) ensure VSI implements adequate data security practices, procedures, infrastructure, and protocols compliant with applicable law and industry standards; (c) ensure VSI has adequate processes in place to quickly detect a data breach and to timely act on warnings regarding data breaches; (d) investigate VSI's data security practices, infrastructure, procedures, and protocols **prior** to retaining VSI; and (e) monitor VSI's security procedures, practices, and protocols during the entirety of the relationship.

116.   PAI and SWC utterly failed to uphold these duties, as evidenced by the Data Breach, thereby breaching their duties owed to Plaintiffs and the Class.

117.   As a direct and proximate cause of PAI and SWC's breaches, and failure to

properly interview and vet VSI, Plaintiffs and the Class have been damaged as set forth herein.

**E.    Defendants Knew of the Risk of a Cyberattack because Businesses in Possession of Private Information are Particularly Susceptible to Breaches.**

118.   Defendants' negligence, including their gross negligence in failing to safeguard Plaintiffs' and Class Members' Private Information, is exacerbated by the repeated warnings and alerts directed to protect and secure sensitive data.

119.   Private Information—including the types accessed in the Data Breach—are of great value to cybercriminals because this information can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the internet black market known as the dark web.

120.   Private Information can also be used to distinguish, identify, or trace an individual's identity, such as his or her name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information connected or linked to an individual such as his or her birthdate, birthplace, and mother's maiden name.

121.   Data thieves regularly target entities that store Private Information like VSI due to the highly sensitive information they maintain. VSI knew and understood that Plaintiffs' and Class Members' Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize it through unauthorized access.

122.   Cyberattacks against institutions like VSI are targeted and frequent. According to Contrast Security's 2023 report, "Cyber Bank Heists: Threats to the financial

28

sector," "[o]ver the past year, attacks have included banking trojans, ransomware, account takeover, theft of client data and cybercrime cartels deploying 'trojanized' finance apps to deliver malware in spear-phishing campaigns."[18]

123.   The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in VSI's industry, including VSI itself, which touts security over customer data to market its services.

124.   VSI's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting entities like VSI that collect and store Private Information preceding the date of the subject Data Breach.

125.   In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,862) set in 2021. [19]

---

[18] Tom Kellermann, *Cyber Bank Heists: Threats to the financial sector*, at 5, CONTRAST SECURITY, available at:
https://www.contrastsecurity.com/hubfs/Cyber%20Bank%20Heists%20Report%202023.pdf?hsLang=en.
[19] *Id.*

126.    Additionally, as companies became more dependent on computer systems to run their business,[20] e.g., working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[21]

127.    Entities with custody of PHI, like VSI, reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach.[22]  Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage. Almost 50% of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all.

---

[20] *FEDS Notes*, *Implications of Cyber Risk for Financial Stability*, BD. GOVERNORS OF THE FED. RES. SYS., (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last visited April 1, 2025).

[21] Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUS, (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last visited April 1, 2025).

[22] *See 2022 Annual Data Breach Report*, ITRC, available at: https://www.idtheftcenter.org/publication/2022-data-breach-report.

Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[23]

128.    Thus, the healthcare industry, and business operating within and aiding the healthcare industry, have become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[24]

129.    PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements.  It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

130.    As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[25] A complete identity theft kit with health

---

[23] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims (last visited April 1, 2025).

[25] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDEXPERTS (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited April 1, 2025).

insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[26]

131.   VSI knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for it.

132.   VSI was clearly aware of the risks it was taking and the harm that could result from inadequate data security but threw caution to the wind.

133.   Similarly, PAI and SWC knew the importance of selecting a vendor and/or independent contractor with adequate data security given the well-publicized rise in data breaches but failed to ensure VSI deployed adequate data security.

134.   As a business in possession of customers' Private Information, VSI knew, or should have known, the importance of safeguarding the Private Information entrusted to it, directly and indirectly, by Plaintiffs and Class Members, and of the foreseeable consequences if its network systems were breached. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to their Private Information's disclosure to cybercriminals. Nevertheless, VSI failed to implement or follow reasonable cybersecurity measures to protect against the foreseeable harm of this Data Breach.

---

[26] *Managing cyber risks in an interconnected world*, PRICEWATERHOUSECOOPERS, (Sept. 30, 2014), available at: https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

135.   Additionally, as businesses in possession of customers' Private Information, PAI and SWC knew or should have known, the importance of safeguarding the Private Information entrusted to it, directly and indirectly, and of the foreseeable consequences if it willingly gave Plaintiffs' and the Class's Private Information to a vendor and/or independent contractor with inadequate data security. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to their Private Information's disclosure to cybercriminals.

136.   Defendants were, or should have been, fully aware of the unique type and the significant volume of data on VSI's network server(s), amounting to thousands of individuals' detailed Private Information, and, thus, the wide extent of individuals who the exposure of that unencrypted data would harm.

137.   Given the nature of the Data Breach, it was foreseeable that Plaintiffs' and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiffs' and Class Members' names.

138.   Plaintiffs and Class Members were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiffs and Class Members especially vulnerable to identity theft, medical and financial fraud, and the like.

**F.      VSI was Required, But Failed, to Comply with FTC Rules and Guidance.**

139.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

140.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which establishes cyber-security guidelines for businesses like VSI. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

141.    The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

142.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

143.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to

employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like VSI must undertake to meet their data security obligations.

144. Such FTC enforcement actions include actions against entities in the healthcare industry like VSI. *See, e.g.*, *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

145. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as VSI, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above are also a basis of VSI's duties in this regard.

146. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit." VSI itself profits from collecting and managing Plaintiffs' and Class Members' data.

147. VSI failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

148. VSI's failure to employ reasonable and appropriate means to protect against unauthorized access to Plaintiffs' and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by the FTC Act.

**G.    VSI was Required, But Failed, to Comply with HIPAA.**

149. VSI is a business associate, as defined under HIPAA (45 C.F.R. §§ 160.102, 160.103), and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A and E; and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A, C, D, and E.

150. VSI is further subject to the Health Information Technology Act ("HITECH")'s rules for safeguarding electronic forms of medical information. *See* 42 U.S.C. §17921; 45 C.F.R. § 160.103.

151. HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting PHI that is kept or transferred in electronic form.

152. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

153. HIPAA's Security Rule required and requires that VSI do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

154. HIPAA also required and requires VSI to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, VSI is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

155. HIPAA and HITECH also require procedures to prevent, detect, contain, and correct data security violations and disclosures of PHI that are reasonably anticipated but not permitted by privacy rules. *See* 45 C.F.R. § 164.306(a)(1), (a)(3).

156. HIPAA further requires business associates like VSI to have and apply appropriate sanctions against members of their workforce who fail to comply with the

privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

157.　Further, HIPAA requires business associates like VSI to mitigate, to the extent practicable, any harmful effect that is known to the entity of a use or disclosure of PHI in violation of the entity's policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the business associate. *See* 45 C.F.R. § 164.530(f).

158.　HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule."[27] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology, which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI."[28]

159.　HIPAA's Breach Notification Rule further requires that within 60 days of discovering a breach of unsecured PHI. VSI must notify each individual affected regarding

---

[27] *Security Rule Guidance Material*, HHS (Aug. 21, 2024), available at: https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.
[28] *Guidance on Risk Analysis*, HHS (July 22, 2024), available at: https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html?language=es.

the nature of the breach, the PHI compromised, steps the individual should take to protect against potential resulting harm, and what VSI is doing to protect against future breaches. 45 C.F.R. § 164.404(b).

160.   HIPAA requires that when a covered entity, like Plaintiffs' and Class Members' health plans serviced by VSI, *see* 45 C.F.R. § 160.103, provides PHI to a business associate, like VSI, the covered entity must require by contract and ensure that the business associate uses appropriate safeguards to protect electronic PHI from unauthorized disclosure. 45 C.F.R. § 164.504(e)(2)(ii).

161.   As alleged herein, VSI violated HIPAA and HITECH. Specifically, VSI (a) failed to maintain adequate security practices, systems, and protocols to prevent data loss, (b) failed to mitigate the risks of a data breach, (c) failed to ensure the confidentiality and protection of PHI, (d) failed to use appropriate safeguards to prevent the unauthorized disclosure of Plaintiffs' and Class Members' Private Information, and (e) failed to provide the required Data Breach notice within 60 days of discovering the incident.

**H.     Defendants Failed to Comply with Industry Standards.**

162.   A number of published industry and national best practices are widely used as a go-to resource when developing an institution's cybersecurity standards.

163.   The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management,

39

Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

164.    The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

a.    Control who logs on to your network and uses your computers and other devices.

b.    Use security software to protect data.

c.    Encrypt sensitive data, at rest and in transit.

d.    Conduct regular backups of data.

e.    Update security software regularly, automating those updates if possible.

f.    Have formal policies for safely disposing of electronic files and old devices.

g.    Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

165.    Further still, CISA makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities

identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.

166.   Upon information and belief, VSI failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

167.   Additionally, as explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take

41

precautions for protection."[29]

168.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, VSI could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

a.  Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

b.  Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

c.  Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d.  Configure firewalls to block access to known malicious IP addresses.

e.  Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

f.  Set anti-virus and anti-malware programs to conduct regular scans automatically.

---

[29] *See How to Protect Your Networks from RANSOMWARE*, at 3, FBI, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

g. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h. Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

j. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

k. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

l. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

m. Execute operating system environments or specific programs in a virtualized environment.

n. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[30]

169. Further, VSI could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

a. **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

b. **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

c. **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

---

[30] *Id.* at 3–4.

d. **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

e. **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

f. **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

g. **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[31]

170. Given that VSI was storing the Private Information of millions of individuals, it could have and should have implemented all the above measures to prevent and detect

---

[31] *See Security Tip (ST19-001) Protecting Against Ransomware*, CISA (original release date Apr. 11, 2019), available at: https://www.cisa.gov/news-events/news/protecting-against-ransomware.

cyberattacks. Moreover, PAI and SWC should have taken efforts to ensure VSI's compliance with industry standards and regulations.

171.   Specifically, among other failures, VSI had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted system.[32]

172.   VSI should have also limited remote access credentials for portions of its network on which Private Information was stored to ensure that stolen credentials cannot be used to access its entire network.

173.   Moreover, it is a well-established industry standard practice for a business to dispose of confidential Private Information once it is no longer needed. The FTC, among others, has repeatedly emphasized the importance of disposing of unnecessary Private Information: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by hackers."[33] VSI, rather than following this basic standard of care, kept thousands of individuals' unencrypted Private Information indefinitely, years after the customer relationship ended. PAI and SWC, in turn, should have affirmatively demanded that VAI implement appropriate clearinghouse practices with respect to Private Information they no longer needed to access.

---

[32] *See, e.g.,* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, FORTRA (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption (April 1, 2025).
[33] *Protecting Personal Information: A Guide for Business*, FTC, available at: https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf, at p. 6.

174. In summary, the Data Breach could have readily been prevented using industry standard network segmentation, limiting access to sensitive information to only essential employees, encryption of all Private Information and implementing appropriate network monitoring practices.

175. The Data Breach could have also been readily prevented by: (a) using two-factor authentication; (b) regularly changing usernames and passwords and using strong usernames and passwords; (c) updating all software often and regularly; (d) using firewalls to restrict access; (e) monitoring the network for signs of existing intrusions or the transfer of large volumes of data; and (f) requiring network level authentication for remote desktop connection.

176. Further, the scope of the Data Breach could have been dramatically reduced had VSI utilized proper record retention and destruction practices.

I. **Defendants Owed Plaintiffs and Class Members Common Law Duties to Safeguard their Private Information.**

177. In addition to its obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. These duties owed to Plaintiffs and Class Members obligated Defendants to provide or ensure reasonable data security consistent with industry standards and requirements to protect Plaintiffs' and Class Members' Private Information in their care from unauthorized

47

disclosure, and to timely and adequately warn Plaintiffs and Class Members in the event their Private Information was compromised.

178.   Furthermore, PAI and SWC owed a duty to Plaintiffs and Class Members to exercise reasonable care in selecting a vendor and/or independent contractor such as VSI. PAI and SWC should have ensured that any vendor and/or independent contractor it selected secured, safeguarded, protected, retained, and deleted, the Private Information in its possession to avoid it from being compromised, lost, stolen, accessed, and misused by unauthorized persons. These duties owed to Plaintiffs and Class Members obligated PAI and SWC to select a vendor and/or independent contractor with reasonable data security consistent with industry standards and requirements to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure, and to timely and adequately warn Plaintiffs and Class Members in the event their Private Information was compromised.

179.   VSI owed duties to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information on how to adequately protect the data.

180.   PAI and SWC owed duties to Plaintiffs and Class Members to ensure any vendor and/or independent contractor hired created and implemented reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training their employees and others who accessed Private Information on how to adequately protect the data.

181. VSI owed duties to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner, before thousands of individuals' Private Information was taken.

182. PAI and SWC owed duties to Plaintiffs and Class Members to ensure any vendor and/or independent contractor hired implemented processes that would detect a compromise of Private Information in a timely manner, before millions of individuals' Private Information was taken.

183. VSI owed duties to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

184. PAI and SWC owed duties to Plaintiffs and Class Members to ensure any vendor and/or independent contractor hired acted upon data security warnings and alerts in a timely fashion

185. VSI owed duties to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred, and the extent of Private Information involved.

186. PAI and SWC owed duties to Plaintiffs and Class Members to ensure any vendor and/or independent contractor they utilized disclosed in a timely and accurate manner when and how the Data Breach occurred, and the extent of Private Information involved.

187. VSI owed duties to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

188. PAI and SWC owed duties to Plaintiffs and Class Members because they were foreseeable and probable victims of any vendors and/or independent contractors with inadequate data security practices.

189. VSI failed to take the necessary precautions to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure. VSI's actions and omissions represent a flagrant disregard of Plaintiffs' and Class Members' rights.

190. PAI and SWC failed to take the necessary precautions to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure. PAI's and SWC's actions and omissions represent a flagrant disregard of Plaintiffs' and Class Members' rights.

### J. Plaintiffs and Class Members Suffered Common Injuries and Damages due to Defendants' Misconduct.

191. VSI's failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' Private Information directly and proximately injured Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

192. PAI's and SWC's failure to ensure the vendor and/or independent contractor utilized implemented or maintained adequate data security measures for Plaintiffs' and Class Members' Private Information directly and proximately injured Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

193. The ramifications of Defendants' failures to keep Plaintiffs' and Class Members' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

194. Plaintiffs and Class Members are also at a continued risk because their Private Information remains in VSI's systems, which have already been shown to be susceptible to compromise and are subject to further attack, so long as VSI fails to undertake the necessary and appropriate security and training measures to protect its customers' Private Information.

195. Upon information and belief, Plaintiffs and Class Members are also at a continued risk of harm because PAI and SWC have not ceased using VSI's services. Plaintiffs and Class Members are subject to further attack so long as PAI and SWC negligently continue to use VSI's services.

196. As a result of VSI's ineffective and inadequate data security practices, the consequential Data Breach, and the foreseeable outcome of Plaintiffs' and Class Members' Private Information ending up in criminals' possession, all Plaintiffs and Class Members have suffered and will continue to suffer the following actual injuries and damages, without limitation: (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft, and related lost opportunity costs; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information;

51

(g) loss of the benefit of their bargain with VSI; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in VSI's possession and is subject to further unauthorized disclosures so long as VSI fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

197.    As a result of PAI and SWC failing to ensure VSI implemented adequate data security practices—resulting in the consequential Data Breach—all Plaintiffs and Class Members have suffered and will continue to suffer the following actual injuries and damages, without limitation: (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft, and related lost opportunity costs; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of the benefit of their bargain; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in VSI's possession and is subject to further unauthorized disclosures so long as PAI and SWC continue to use VSI's services.

***The Risk of Identity Theft to Plaintiffs and Class Members is Present and Ongoing.***

198.    Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

199.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[34] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[35]

200.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

201.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[36] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is

---

[34] 17 C.F.R. § 248.201 (2013).
[35] *Id.*
[36] Louis DeNicola, *What Is the dark web?*, EXPERIAN (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited April 1, 2025).

ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[37]   This   prevents

dark web marketplaces from being easily monitored by authorities or accessed by those not

in the know.

202.   A sophisticated black market exists on the dark web where criminals can buy

or sell malware, firearms, drugs, and frequently, PHI and PII like the Private Information

at issue here.[38] The digital character of Private Information stolen in data breaches lends

itself to dark web transactions because it is immediately transmissible over the internet and

the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other

hand requires a physical delivery address. Nefarious actors can readily purchase usernames

and passwords for online streaming services, stolen financial information and account login

credentials, and Social Security numbers, dates of birth, and medical information.[39] As

Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would

seek to do financial harm to others."[40]

203.   The unencrypted Private Information of Plaintiffs and Class Members will

end up for sale on the dark web because that is the *modus operandi* of hackers. In addition,

unencrypted and detailed Private Information may fall into the hands of companies that

---

[37] *Id.*

[38] *What is the dark web?*, MICROSOFT 365 (July 15, 2022), https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited April 1, 2025).

[39] *Id.*; Louis DeNicola, *What Is the dark web?*, EXPERIAN (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited April 1, 2025).

[40] *What is the dark web?*, MICROSOFT 365 (July 15, 2022), https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited April 1, 2025).

will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized actors can easily access and misuse Plaintiffs' and Class Members' Private Information due to the Data Breach.

204. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

205. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

206. Another such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[41]

---

[41] "Fullz" is fraudster speak for data that includes the victim's information, including but not limited to name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used

207.    With "Fullz" packages, cybercriminals can cross-reference two (2) sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

208.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

209.    Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

210.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

211.    The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class

---

for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Recs. for Sale in Underground Stolen from Texas Life Ins. Firm*, KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited April 1, 2025).

Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

212.    Social Security numbers, for example, are among the worst kind of personal information to have been stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems. [42]

213.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and

---

[42] *Identity Theft and Your Social Security Number*, Pub. No. 06-10064, SOCIAL SECURITY ADMIN. (June 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

other private information increases."[43] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[44]

214.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[45] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[46]

215.    What is more, it is no easy task to change or cancel a stolen Social Security number.  An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

216.    Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[47]

---

[43] *See Avoid Identity Theft: Protect Social Security Numbers*, SOCIAL SECURITY ADMIN., https://www.ssa.gov/phila/ProtectingSSNs.htm (last visited April 1, 2025).
[44] *Id.*
[45] *See How to Protect Yourself from Social Security Number Identity Theft*, EQUIFAX https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft (last visited April 1, 2025).
[46] *See* Julia Kagan, *What is an SSN? What to Know About Social Security Numbers*, INVESTOPEDIA (Sept. 2, 2024), https://www.investopedia.com/terms/s/ssn.asp (last visited April 1, 2025).
[47] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited April 1, 2025).

217.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for credit lines.[48]

218.    For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft.

219.    Similarly, the California state government warns consumers: "Originally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[49]

220.    Theft of PHI, in particular, is gravely serious as well: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with

---

[48] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMIN. (2018), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

[49] *See Your Social Security Number: Controlling the Key to Identity Theft*, OFFICE OF THE ATTORNEY GENERAL OF CAL., https://oag.ca.gov/idtheft/facts/your-ssn (last visited April 1, 2025).

your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[50]

221.    PHI is likely to be used in detrimental ways, including by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[51]

222.    Another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[52]

223.    "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[53]

224.    "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[54]

---

[50] *See What to Know About Medical Identity Theft*, FED. TRADE COMM'N, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited April 1, 2025).

[51] *Id.*

[52] *70% Of Data Involved In Healthcare Breaches Increases Risk of Fraud*, DISTILINFO (Oct. 3, 2019), https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud (last visited April 1, 2025).

[53] *Id.*

[54] *The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches*, EXPERIAN, available at: https://stg1.experian.com/assets/data-breach/white-papers/experian-medical-id-theft-healthcare.pdf.

225. The reality is that cybercriminals seek nefarious outcomes from a data breach" and "stolen health data can be used to carry out a variety of crimes."[55]

226. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice,

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss. [56]

227. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[57]

228. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[58] Yet,

---

[55] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH (Oct. 30, 2019) https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited April 1, 2025).

[56] Erika Harrell, *Bureau of Just. Stat.*, NCJ 256085, U.S. DEP'T OF JUST., *Victims of Identity Theft*, 2018 I (2020), available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

[57] *See 2019 Internet Crime Report Released*, FBI (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited April 1, 2025).

[58] *Id.*

VSI failed to rapidly report to Plaintiffs and Class Members that their Private Information was stolen.

229.   Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

230.   In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

231.   Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Loss of Time to Mitigate the Risk of Identify Theft and Fraud.***

232.   As a result of the recognized risk of identity theft, when a data breach occurs, an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the

asset of time has been lost.

233.    In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face substantial costs and time to repair the damage to their good name and credit record.

234.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

235.    Plaintiffs and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

236.    These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[59]

237.    Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For

---

[59] *See What to do Right Away, FTC*, https://www.identitytheft.gov/Steps (last visited Apr. 1, 2025)

this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of VSI's conduct and failures that caused the Data Breach.

***Diminished Value of Private Information.***

238.   Private Information is a valuable property right.[60] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value. Indeed, VSI itself profits from Plaintiffs' and Class Members' data.

239.   For example, drug and medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongly disclosed PHI to adjust their insureds' medical insurance premiums.

240.   Private Information can sell for as much as $363 per record according to the Infosec Institute.[61]

---

[60] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PRIVATE INFORMATION") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3–4 (2009) ("PRIVATE INFORMATION, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[61] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited April 1, 2025).

241.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data sells on the dark web for $50 and up.

242.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[62] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[63] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[64]

243.    Moreover, Private Information derives its value from its confidential nature and consumers use it to verify identities, gain access to financial or medical services, and verify eligibility for employment. Once the confidential nature of Private Information is destroyed, consumers ability use that information unfettered is impacted and the value of that information is diminished.

244.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

---

[62] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, LA TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Apr. 1, 2025).

[63] DATACOUP, https://datacoup.com/ (last visited April 1, 2025).

[64]    *Frequently    Asked    Questions*,    NIELSEN,    available    at: https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

245.   However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

***Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary.***

246.   To date, Defendants have done little to nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breach.

247.   Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money, filing false tax returns, taking out loans or lines of credit, or filing false unemployment claims.

248.   Such fraud may go undetected until debt collection calls commence months or even years later. An individual may not know that her or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

249.   Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card

accounts.[65] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers). Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future, if not forever.

250.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from VSI's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for VSI's failure to safeguard their Private Information.

***Loss of Benefit of the Bargain.***

251.    Furthermore, the acts and omissions complained of herein deprived Plaintiffs and Class Members of the benefit of their bargain with PAI and SWC.

252.    When agreeing to provide their Private Information, directly or indirectly, which was a condition precedent to obtain benefit administration, data management, and related services from VSI, and paying VSI, PAI, and SWC, directly or indirectly, for these products and services, Plaintiffs and Class Members understood and expected that they were, in part, paying a premium for services and data security to protect the Private Information they were required to provide.

---

[65] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The dark web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited April 1, 2025).

67

253. In fact, Defendants did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than they reasonably expected to receive under the bargains they struck with Defendants.

## V. PLAINTIFFS' EXPERIENCES AND INJURIES

### *Plaintiff Payson Clarke*

254. Plaintiff Clarke received a Notice Letter from VSI informing him that his highly confidential Private Information was compromised in the Data Breach.

255. Upon information and belief, VSI obtained Plaintiff Clarke's Private Information through his wife's former employer, SWC.

256. Plaintiff Clarke greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Clarke diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

257. At the time of the Data Breach—on or about February 27, 2024—VSI retained Plaintiff Clarke's Private Information on its network with inadequate data security and in unencrypted form, causing Plaintiff Clarke's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

258. As a result of the Data Breach, Plaintiff Clarke has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, reviewing account statements, credit reports, and/or other information, and placing a

security freeze with the credit bureaus (which caused further inconvenience and damage in that Plaintiff Clarke is now deprived of access to his own credit). Plaintiff Clarke estimates he has spent *over 100 hours* on these mitigation activities in response to the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

259. Plaintiff Clarke further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Clarke is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

260. The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Clarke's and Class Members' Private Information was targeted, accessed, and stolen.

261. Plaintiff Clarke further believes his Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach—if this has not happened already—as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type

262. Plaintiff Clarke additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as his phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such

69

information. These include phishing texts and emails attempting to secure more data from him, which Plaintiff Clarke attributes to the Data Breach.

263. The Data Breach caused Plaintiff Clarke to suffer fear, anxiety, and stress, knowing that thieves intentionally targeted and stole his Private Information, including his Social Security number, and knowing that his Private Information is in the hands of cybercriminals. The Data Breach has caused Plaintiff Clarke great anxiety beyond mere worry; he has lost hours of sleep, is in a constant state of stress, is very frustrated, and is in a state of persistent worry now that his Private Information has been stolen, which has been compounded by the fact that VSI has still not fully informed him of key details about the Data Breach's occurrence or the extent of Private Information compromised.

### Plaintiff Stacey Sanchez

264. Plaintiff Sanchez received a Notice Letter from VSI informing her that her highly confidential Private Information was compromised in the Data Breach.

265. Upon information and belief, VSI obtained Plaintiff Sanchez's Private Information through her former employer, SWC.

266. Plaintiff Sanchez greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Sanchez diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

267. At the time of the Data Breach—on or about February 27, 2024—VSI retained Plaintiff Sanchez's Private Information on its network with inadequate data

70

security and in unencrypted form, causing Plaintiff Sanchez's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

268. As a result of the Data Breach, Plaintiff Sanchez made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to investigating the Data Breach, investigating how best to ensure that she is protected from identity theft, reviewing account statements, credit reports, and/or other information, and placing a security freeze with the credit bureaus (which caused further inconvenience and damage in that Plaintiff Sanchez is now deprived of access to her own credit). Plaintiff Sanchez estimates she has spent *over 100 hours* on these mitigation activities in response to the Data Breach--valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

269. Plaintiff Sanchez further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Sanchez is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

270. The risk of identity theft is impending and has materialized, as there is evidence Plaintiff Sanchez's and Class Members' Private Information was targeted, accessed, and stolen by criminals.

271. Plaintiff Sanchez further believes her Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data

Breach—if this has not happened already—as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type

272.    Plaintiff Sanchez additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. These include phishing texts and emails attempting to secure more information from her, which she attributes to the Data Breach.

273.    The Data Breach caused Plaintiff Sanchez to suffer fear, anxiety, and stress, knowing that thieves intentionally targeted and stole her Private Information, including her Social Security number, and knowing that her Private Information is in the hands of cybercriminals. The Data Breach has caused Plaintiff Sanchez great anxiety beyond mere worry; she has lost hours of sleep, is in a constant state of stress, is very frustrated, and is in a state of persistent worry now that her Private Information has been stolen, which has been compounded by the fact that VSI have still not fully informed her of key details about the Data Breach's occurrence or the extent of Private Information compromised.

*Plaintiff Scott Wagner*

274.    As a condition of receiving benefit administration, data management, and related services from VSI, Plaintiff Wagner was required to supply VSI with his Private

72

Information, including but not limited to his full name, Social Security number, and health information.

275.   Plaintiff Wagner greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Wagner diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

276.   At the time of the Data Breach—on or about February 27, 2024—VSI retained Plaintiff Wagner's Private Information on network systems with inadequate data security and in unencrypted form, causing Plaintiff Wagner's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

277.   As a result of the Data Breach, and at the direction of VSI's Notice Letter, which instructs Plaintiffs to "remain vigilant by reviewing your account statements and monitoring free credit reports closely for errors and by taking other steps appropriate to protect accounts, including promptly changing passwords[,]" Plaintiff Wagner has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy and underlying facts of the Data Breach and monitoring his credit reports for suspicious activity or notifications that his Private Information was found on the dark web. Plaintiff Wagner has spent significant time on mitigation activities in response to the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

278. Plaintiff Wagner further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Wagner is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

279. The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Wagner's and Class Members' Private Information was targeted, accessed, and stolen by criminals.

280. Additionally, following the Data Breach, Plaintiff Wagner received notifications that his Private Information had been found on the dark web.

281. Plaintiff Wagner further believes his Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type

282. Plaintiff Wagner has additionally suffered actual misuse of his Private Information and corresponding injury in the form of experiencing an increase in spam calls, texts, and emails, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about a person, such as his phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

283. The Data Breach has caused Plaintiff Wagner to suffer fear, anxiety, and stress, which has been compounded by the fact that VSI has still not fully informed him of

key details about the Data Breach's occurrence or the extent of Private Information compromised.

*Plaintiff Richard Almeda*

284. Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of his employment, Plaintiff was required to indirectly supply Defendant with his Private Information, including his name, date of birth, Social Security number, gender information, and address. Plaintiff provided his Private Information to his employer for employee benefits administration services to be performed by Defendant.

285. Plaintiff is a Data Breach victim, having received a Breach Notice from VeriSource informing him that he was affected by the Data Breach.

286. Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

287. Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

288. As a result of the Data Breach, Plaintiff Almeda made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and

75

monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

289. Plaintiff (or his current, former, or prospective employers) provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

290. Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

291. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

292. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

293. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

294. Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

295. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

296. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Almeda's Private Information right in the hands of criminals.

297. In fact, Plaintiff has received numerous notifications of fraudulent attempts to use his credit cards. Just within the past year, these fraudulent attempts have occurred at least ten times. Each of these fraudulent attempts exceeds $500, with some attempts charging Plaintiff Almeda as much as $1,000.

298. In addition, following the Data Breach, Plaintiff Almeda has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather his personal information.

299. Indeed, since the Data Breach occurred, Plaintiff Almeda receives as many as 100 unsolicited spam calls in a single day.

300. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

301. Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

*Plaintiff Nankumar Bacchus*

302.    Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of his employment, Plaintiff was required to indirectly supply Defendant with his Private Information, including his name, date of birth, Social Security number, gender information, and address. Plaintiff provided his Private Information to his employer for employee benefits administration services to be performed by Defendant.

303.    Plaintiff is a Data Breach victim, having received a Breach Notice from VeriSource informing him that he was affected by the Data Breach.

304.    Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

305.    Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

306.    As a result of the Data Breach, Plaintiff Bacchus made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time he

otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

307.  Plaintiff (or his current, former, or prospective employers) provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

308.  Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

309.  Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

310.  Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

311.  Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

312.  Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

313.   Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

314.   Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Bacchus's Private Information right in the hands of criminals.

315.   In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather his personal information.

316.   Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

317.   Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

**Plaintiff Jassir Bueno**

318.   Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of his employment, Plaintiff was required to indirectly supply Defendant with his Private Information, including his name, date of birth, Social Security number, gender information, and address. Plaintiff provided his Private Information to his employer for employee benefits administration services to be performed by Defendant.

319.   Plaintiff is a Data Breach victim, having received a Breach Notice dated April

80

23, 2025.

320. Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

321. Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

322. As a result of the Data Breach, Plaintiff Bueno made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

323. Plaintiff (or his current, former, or prospective employers) provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

324.    Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

325.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

326.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

327.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

328.    Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

329.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

330.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Bueno's Private Information right in the hands of criminals.

331.    In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather his

personal information.

332. Indeed, Plaintiff Bueno has received roughly 15,000 spam messages since the Data Breach. Plaintiff Bueno is likewise inundated with spam calls.

333. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

334. Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

### Plaintiff Dmario Davis

335. Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of his employment, Plaintiff was required to indirectly supply Defendant with his Private Information, including his name, date of birth, Social Security number, gender information, and address. Plaintiff provided his Private Information to his employer for employee benefits administration services to be performed by Defendant.

336. Plaintiff is a Data Breach victim, having received a Breach Notice from VeriSource informing him that he was affected by the Data Breach.

337. Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

338. Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private

83

Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

339.   As a result of the Data Breach, Plaintiff Davis made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

340.   Plaintiff (or his current, former, or prospective employers) provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

341.   Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

342.   Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

343. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

344. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

345. Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

346. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

347. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Davis's Private Information right in the hands of criminals.

348. Indeed, since the Data Breach, Plaintiff Davis has already received a credit report alleging information that Plaintiff Davis believes is false.

349. Plaintiff Davis has received notifications that fraudulent financial transactions totaling nearly $10,000 have been attributed to his name. These include a student loan in the amount of $2,250 and a grant in the amount of $7,000.

350. Furthermore, Plaintiff Davis is now linked to an FSA account showing an address at which he has never lived and a phone number that he has never held.

351. CreditKarma has informed Plaintiff Davis that his identity has been stolen,

85

and TransUnion's credit reporting system has informed Plaintiff Davis of at least one suspicious inquiry tied to his account.

352.   In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, many of which attempt to gather his personal information.

353.   Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

354.   Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

### Plaintiff Herbert Diggs

355.   Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of his employment, Plaintiff was required to indirectly supply Defendant with his Private Information, including his name, date of birth, Social Security number, gender information, and address. Plaintiff provided his Private Information to his employer for employee benefits administration services to be performed by Defendant.

356.   Plaintiff is a Data Breach victim, having received a Breach Notice from VeriSource informing him that he was affected by the Data Breach.

357.   Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

358.   Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his private information in a safe and secure

location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

359.   As a result of the Data Breach, Plaintiff Diggs made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

360.   Plaintiff (or his current, former, or prospective employers) provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

361.   Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

362.   Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed

Plaintiff to take those steps in its breach notice.

363.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

364.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

365.    Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

366.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

367.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Diggs's Private Information right in the hands of criminals.

368.    In fact, Plaintiff has received numerous notifications of fraudulent attempts to use his credit cards. Plaintiff received three notifications that someone attempted to use his credit card to open an account at a hardware store. One of the fraudulent attempts was successful in purchasing a $319 tool set, which Plaintiff was forced to pay for out-of-pocket and still has not been reimbursed for.

369.    In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather his

personal information.

370. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

371. Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

### *Plaintiff Annette Falcon*

372. Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of her employment, Plaintiff was required to indirectly supply Defendant with her Private Information, including her name, date of birth, Social Security number, gender information, and address. Plaintiff provided her Private Information to her employer for employee benefits administration services to be performed by Defendant.

373. Plaintiff is a Data Breach victim, having received a Breach Notice from VeriSource informing her that she was affected by the Data Breach.

374. Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

375. Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant had her known of Defendant's lax data

security policies.

376.   As a result of the Data Breach, Plaintiff Falcon made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time her otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

377.   Plaintiff (or her current, former, or prospective employers) provided her Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

378.   Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

379.   Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

380.   Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

381.   Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

382.   Plaintiff suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

383.   Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

384.   Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Falcon's Private Information right in the hands of criminals.

385.   Indeed, Plaintiff Falcon has already experienced a fraudulent attempt to open a banking account using her private information.

386.   In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather her personal information.

387.   Many of these spam communications, for example, are from employers that Plaintiff Falcon has never applied to. Upon information and belief, these employers fraudulently received Plaintiff Falcon's information from parties that now improperly possess Plaintiff Falcon's private information.

388.   Because of the Data Breach, Plaintiff anticipates spending considerable

91

amounts of time and money to try and mitigate her injuries.

389.    Today, Plaintiff has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

*Plaintiff Alexander Farley*

390.    Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of his employment, Plaintiff was required to indirectly supply Defendant with his Private Information, including his name, date of birth, Social Security number, gender information, and address. Plaintiff provided his Private Information to his employer for employee benefits administration services to be performed by Defendant.

391.    Plaintiff is a Data Breach victim, having received a Breach Notice dated April 23, 2025.

392.    Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

393.    Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

394.    As a result of the Data Breach, Plaintiff Farley made reasonable efforts to

92

mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

395.   Plaintiff (or his current, former, or prospective employers) provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

396.   Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

397.   Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

398.   Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

399.   Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such

injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

400.    Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

401.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

402.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Farley's Private Information right in the hands of criminals.

403.    In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather his personal information.

404.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

405.    Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

**Plaintiff Frank Fazio**

406.    Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of his employment, Plaintiff was required to indirectly supply Defendant with his Private

Information, including his name, date of birth, Social Security number, gender information, and address. Plaintiff provided his Private Information to his employer for employee benefits administration services to be performed by Defendant.

407. Plaintiff is a Data Breach victim, having received a Breach Notice dated April 23, 2025.

408. Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

409. Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

410. As a result of the Data Breach, Plaintiff Fazio made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

411. Plaintiff (or his current, former, or prospective employers) provided his Private Information to Defendant and trusted the company would use reasonable measures

to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

412. Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

413. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

414. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

415. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

416. Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

417. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

418. Plaintiff suffered imminent and impending injury arising from the

substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Fazio's Private Information right in the hands of criminals.

419. In fact, the credit monitoring services that Plaintiff Fazio now utilizes have informed him that his personal information has been published on the Dark Web.

420. In addition, following the Data Breach, Plaintiff Fazio has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather his personal information.

421. As a result of this drastic increase in spam communications, Plaintiff Fazio was forced to change the phone numbers for both his landline phone and cell phone.

422. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

423. Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

### Plaintiff Kelvin Gill

424. Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of his employment, Plaintiff was required to indirectly supply Defendant with his Private Information, including his name, date of birth, Social Security number, gender information, and address. Plaintiff provided his Private Information to his employer for employee benefits administration services to be performed by Defendant.

425. Plaintiff is a Data Breach victim, having received a Breach Notice dated April

23, 2025.

426. Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

427. Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

428. As a result of the Data Breach, Plaintiff Gill made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

429. Plaintiff (or his current, former, or prospective employers) provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

430.   Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

431.   Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

432.   Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

433.   Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

434.   Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

435.   Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

436.   Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Gill's Private Information right in the hands of criminals.

437.   In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather his

personal information.

438.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

439.    Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Bruce Knights***

440.    Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of his employment, Plaintiff was required to indirectly supply Defendant with his Private Information, including his name, date of birth, Social Security number, gender information, and address. Plaintiff provided his Private Information to his employer for employee benefits administration services to be performed by Defendant.

441.    Plaintiff is a Data Breach victim, having received a Breach Notice from VeriSource informing him that he was affected by the Data Breach.

442.    Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

443.    Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant had he known of Defendant's lax data

security policies.

444.    As a result of the Data Breach, Plaintiff Knights made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

445.    Plaintiff (or his current, former, or prospective employers) provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

446.    Through the Data Breach, Defendant exposed at least some of Plaintiff's private information which includes—at least—Plaintiff Knights's Social Security number and credit card information. Upon information and belief, Plaintiff Knights's name, gender information, address, and date of birth have been exposed as well.

447.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

448.    Plaintiff fears for his personal financial security and worries about what

information was exposed in the Data Breach.

449.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

450.    Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

451.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

452.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Knights's Private Information right in the hands of criminals.

453.    Since the Data Breach occurred, Plaintiff Knights has received multiple emails from the IRS informing him that his taxes were not done correctly. Upon information and belief, these emails are a direct result of this Data Breach, and Plaintiff Knights was told to inform the IRS that he may be the victim of fraudulent filing.

454.    Plaintiff has also experienced a fraudulent credit card charge following the data breach wherein an unknown individual charged Plaintiff Knights's credit card for nearly $150.

455.    In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather his

personal information.

456.   Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

457.   Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Joyce Popoola***

458.   Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of her employment, Plaintiff was required to indirectly supply Defendant with her Private Information, including her name, date of birth, Social Security number, gender information, and address. Plaintiff provided her Private Information to her employer for employee benefits administration services to be performed by Defendant.

459.   Plaintiff is a Data Breach victim, having received a Breach Notice from VeriSource informing her that she was affected by the Data Breach.

460.   Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

461.   Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant had she known of Defendant's lax data

103

security policies.

462.    As a result of the Data Breach, Plaintiff Popoola made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

463.    Plaintiff (or her current, former, or prospective employers) provided her Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

464.    Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

465.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

466.    Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

467. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

468. Plaintiff suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

469. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

470. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Popoola's Private Information right in the hands of criminals.

471. Indeed, Plaintiff Popoola has received thirteen notifications that her personal information is now published on the Dark Web where, upon information and belief, her personal information will be exploited, sold, and fraudulently used to Plaintiff Popoola's detriment.

472. Plaintiff Popoola has improperly received unsolicited messages from both PayPal and Netflix seeking her account information. However, Plaintiff Popoola initiated contacted with neither PayPal nor Netflix during either of these interactions.

473. In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather her personal information.

474. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

475. Today, Plaintiff has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

**Plaintiff Kimberly Touchton**

476. Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of her employment, Plaintiff was required to indirectly supply Defendant with her Private Information, including her name, date of birth, Social Security number, gender information, and address. Plaintiff provided her Private Information to her employer for employee benefits administration services to be performed by Defendant.

477. Plaintiff is a Data Breach victim, having received a Breach Notice from VeriSource informing her that she was affected by the Data Breach.

478. Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

479. Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies.

106

480.    As a result of the Data Breach, Plaintiff Touchton made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

481.    Plaintiff (or her current, former, or prospective employers) provided her Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

482.    Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

483.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

484.    Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

485.    Because of Defendant's Data Breach, Plaintiff has suffered—and will

continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

486.    Plaintiff suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

487.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

488.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Touchton's Private Information right in the hands of criminals.

489.    In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather her personal information.

490.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

491.    Today, Plaintiff has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

**Plaintiff Marah West**

492.    Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of

108

her employment, Plaintiff was required to indirectly supply Defendant with her Private Information, including her name, date of birth, Social Security number, gender information, and address. Plaintiff provided her Private Information to her employer for employee benefits administration services to be performed by Defendant.

493.   Plaintiff is a Data Breach victim, having received a Breach Notice from VeriSource informing her that she was affected by the Data Breach.

494.   Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

495.   Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies.

496.   As a result of the Data Breach, Plaintiff West made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

497.   Plaintiff (or her current, former, or prospective employers) provided her

109

Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

498. Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

499. Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

500. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

501. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

502. Plaintiff suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

503. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

504.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff West's Private Information right in the hands of criminals.

505.    Following the Data Breach, Plaintiff West has received a notification from Experian that her personal information was published on the Dark Web. Upon information and belief, Plaintiff West's personal information will now be exploited, sold, and fraudulently used on the Dark Web where it is unable to be removed.

506.    In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather her personal information.

507.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

508.    Today, Plaintiff has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

### Plaintiff Sarah White

509.    Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of her employment, Plaintiff was required to indirectly supply Defendant with her Private Information, including her name, date of birth, Social Security number, gender information, and address. Plaintiff provided her Private Information to her employer for employee benefits administration services to be performed by Defendant.

111

510.   Plaintiff is a Data Breach victim, having received a Breach Notice from VeriSource informing her that she was affected by the Data Breach.

511.   Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

512.   Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her private information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies.

513.   As a result of the Data Breach, Plaintiff White made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

514.   Plaintiff (or her current, former, or prospective employers) provided her Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized

access and disclosure.

515. Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

516. Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

517. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

518. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

519. Plaintiff suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

520. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

521. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff White's Private Information right in the hands of criminals.

522. Indeed, since the Data Breach, Plaintiff White has experienced multiple

fraudulent loan applications attempting to use her name.

523.    In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather her personal information.

524.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

525.    Today, Plaintiff has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

### *Plaintiff Aaron Williams*

526.    Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations. As a condition of his employment, Plaintiff was required to indirectly supply Defendant with his Private Information, including his name, date of birth, Social Security number, gender information, and address. Plaintiff provided his Private Information to his employer for employee benefits administration services to be performed by Defendant.

527.    Plaintiff is a Data Breach victim, having received a Breach Notice dated April 23, 2025.

528.    Thus, Defendant obtained and maintained Plaintiff's Private Information. And as a result, Plaintiff was injured by Defendant's Data Breach.

529.    Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his private information in a safe and secure

location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

530. As a result of the Data Breach, Plaintiff Williams made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing credit monitoring and identity theft protection services and monitoring financial accounts for any unusual activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach – valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

531. Plaintiff (or his current, former, or prospective employers) provided his Private Information to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

532. Upon information and belief, Defendant exposed at least some of Plaintiff's private information including Plaintiff's name, Social Security number, date of birth, address, gender information, and more.

533. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed

115

Plaintiff to take those steps in its breach notice.

534. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

535. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

536. Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

537. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

538. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff Williams's Private Information right in the hands of criminals.

539. Indeed, Plaintiff Williams has experienced numerous communications from accounts fraudulently applied for. For example, Plaintiff Williams has improperly received calls regarding credit approval for accounts that he did not apply for, and he has received calls regarding health insurance plans that he never applied for.

540. In addition, following the Data Breach, Plaintiff has experienced a significant increase in spam calls, texts, and email messages, many of which attempt to gather his personal information.

541. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

542. Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Tonya Holcomb***

543. Plaintiff Holcomb received a Notice Letter from VSI informing her that her highly confidential Private Information was compromised in the Data Breach.

544. Upon information and belief, VSI obtained Plaintiff Holcomb's Private Information through PAI.

545. Plaintiff Holcomb greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Holcomb diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

546. At the time of the Data Breach—on or about February 27, 2024—VSI retained Plaintiff Holcomb's Private Information on its network with inadequate data security and in unencrypted form, causing Plaintiff Holcomb's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

547. As a result of the Data Breach, Plaintiff Holcomb made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to investigating the Data Breach, investigating how best to ensure that she is protected from identity theft, reviewing

account statements, credit reports, and/or other information and changing passwords on her accounts. Plaintiff Holcomb estimates she has spent *over 20 hours* on these mitigation activities in response to the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

548. Plaintiff Holcomb further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Holcomb is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

549. The risk of identity theft is impending and has materialized, as there is evidence Plaintiff Holcomb's and Class Members' Private Information was targeted, accessed, and stolen by criminals.

550. Plaintiff Holcomb further believes her Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach—if this has not happened already—as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type. The Data Breach caused Plaintiff Holcomb to suffer fear, anxiety, and stress, knowing that thieves intentionally targeted and stole her Private Information, including her Social Security number, and knowing that her Private Information is in the hands of cybercriminals. The Data Breach has caused Plaintiff Holcomb great anxiety beyond mere worry; she is in a constant state of stress, is very frustrated, and is in a state of persistent worry now that her Private Information has been stolen, which has been compounded by the fact that Defendants have still not fully

informed her of key details about the Data Breach's occurrence or the extent of Private Information compromised.

***Plaintiff Shinika Hendricks***

551.    Plaintiff Hendricks received a Notice Letter from VSI informing her that her highly confidential Private Information was compromised in the Data Breach.

552.    Upon information and belief, VSI obtained Plaintiff Hendricks's Private Information through PAI.

553.    Plaintiff Hendricks greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Hendricks diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

554.    At the time of the Data Breach—on or about February 27, 2024—VSI retained Plaintiff Hendricks's Private Information on its network with inadequate data security and in unencrypted form, causing Plaintiff Hendricks's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

555.    As a result of the Data Breach, Plaintiff Hendricks made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to investigating the Data Breach, investigating how best to ensure that she is protected from identity theft, reviewing account statements, credit reports, and/or other information.Plaintiff Hendricks estimates she has spent ***over 15 hours*** on these mitigation activities in response to the Data Breach—valuable time she otherwise would have spent on other activities, including but

119

not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

556. Plaintiff Hendricks further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Hendricks is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

557. The risk of identity theft is impending and has materialized, as there is evidence Plaintiff Hendricks's and Class Members' Private Information was targeted, accessed, and stolen by criminals.

558. Plaintiff Hendricks further believes her Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach—if this has not happened already—as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type

559. Plaintiff Hendricks additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and emails, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. These include phishing texts and emails attempting to secure more information from her, which she attributes to the Data Breach.

560. The Data Breach caused Plaintiff Hendricks to suffer fear, anxiety, and stress,

knowing that thieves intentionally targeted and stole her Private Information, including her Social Security number, and knowing that her Private Information is in the hands of cybercriminals. The Data Breach has caused Plaintiff Hendricks great anxiety beyond mere worry; she has lost hours of sleep, is in a constant state of stress, is very frustrated, and is in a state of persistent worry now that her Private Information has been stolen, which has been compounded by the fact that VSI have still not fully informed her of key details about the Data Breach's occurrence or the extent of Private Information compromised.

### *Plaintiff Andrew Wheaton*

561.   Plaintiff Wheaton received a Notice Letter from VSI informing him that his highly confidential Private Information was compromised in the Data Breach.

562.   Upon information and belief, VSI obtained Plaintiff Wheaton's Private Information through PAI.

563.   Plaintiff Wheaton greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Wheaton diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

564.   At the time of the Data Breach—on or about February 27, 2024—VSI retained Plaintiff Wheaton's Private Information on its network with inadequate data security and in unencrypted form, causing Plaintiff Wheaton's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

565.   As a result of the Data Breach, Plaintiff Wheaton has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, reviewing account statements, credit reports, and/or other information. Plaintiff Wheaton estimates he has spent *over 10 hours* on these mitigation activities in response to the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

566.   Plaintiff Wheaton further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Wheaton is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

567.   The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Wheaton's and Class Members' Private Information was targeted, accessed, and stolen.

568.   Plaintiff Wheaton further believes his Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach—if this has not happened already—as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type

569.   Plaintiff Wheaton additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the

information compromised in the Data Breach to find more information about an individual, such as his phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. These include phishing texts and emails attempting to secure more data from him, which Plaintiff Wheaton attributes to the Data Breach.

570. The Data Breach caused Plaintiff Wheaton to suffer fear, anxiety, and stress, knowing that thieves intentionally targeted and stole his Private Information, including his Social Security number, and knowing that his Private Information is in the hands of cybercriminals. The Data Breach has caused Plaintiff Wheaton great anxiety beyond mere worry; he has lost hours of sleep, is in a constant state of stress, is very frustrated, and is in a state of persistent worry now that his Private Information has been stolen, which has been compounded by the fact that VSI has still not fully informed him of key details about the Data Breach's occurrence or the extent of Private Information compromised.

## VI. CLASS ACTION ALLEGATIONS

571. Plaintiffs bring this nationwide class action on behalf of themselves, and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

572. The Classes Plaintiffs seek to represent are defined as follows ("Class"):

**<u>Nationwide Class:</u>**

All United States citizens whose Private Information was compromised in the Data Breach, including all persons who were sent a Notice Letter.

573. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

574. Plaintiffs reserve the right to amend the definition of the Class or add a Class or Subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

575. Numerosity. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiffs and exclusively in the possession of VSI, upon information and belief, the number of individuals impacted is approximately three to four million.

576. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

    a.    Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiffs and Class Members;

    b.    Whether VSI had the duty not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

124

c. Whether VSI had the duty not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d. Whether Defendants failed to safeguard the Private Information of Plaintiffs and Class Members;

e. Whether and when VSI actually learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g. Whether Defendants violated the law by failing to timely notify Plaintiffs and Class Members that their Private Information had been compromised;

h. Whether VSI failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether SWC failed to ensure VSI implemented and maintained reasonable data security procedures and practices to prevent the Data Breach;

j. Whether VSI adequately addressed and fixed the vulnerabilities that permitted the Data Breach to occur;

k. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct; and,

l.    Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

577.    Typicality. Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

578.    Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

579.    Adequacy. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

580. <u>Superiority and Manageability</u>. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

581. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

582. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

583. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

584. Unless a Class-wide injunction is issued, Defendants may continue to inadequately protect and secure the Private Information of Class Members, may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and may continue to act unlawfully as set forth in this Complaint.

585. Further, Defendants acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

586. Likewise, particular issues under Rule 23(c)(2) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.   Whether Defendants failed to timely notify the Plaintiffs and the class of the Data Breach;

    b.   Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information and selecting vendors and/or independent contractors;

c.   Whether VSI's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.   Whether VSI's failure to institute adequate protective security measures amounted to negligence;

e.   Whether VSI failed to take commercially reasonable steps to safeguard their customers' Private Information; and,

f.   Whether adherence to FTC and/or HIPAA data security rules, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## VII.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Nationwide Class against all Defendants)

587.   Plaintiffs re-allege and incorporate by reference paragraphs 1–570 above as if fully set forth herein.

588.   Defendants required Plaintiffs and Class Members to submit, directly or indirectly, personal, confidential Private Information to VSI as a condition of receiving services and benefits.

589.   The Private Information included Plaintiffs' and Class Members' names, dates of birth, Social Security numbers, and health information.

590.   Defendants had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiffs and Class Members could

129

and would suffer if the Private Information was wrongfully disclosed to unauthorized persons.

591. Defendants had duties to Plaintiffs and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information.

592. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices by VSI.

593. Plaintiffs and Class Members had no ability to protect their Private Information in VSI' possession.

594. By collecting and storing Plaintiffs' and Class Members' Private Information, Defendants had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the Private Information from theft.

595. VSI's duty of care obligated it to implement processes by which it could detect if Private Information was exposed to unauthorized actors and have processes in place through which it could detect if Private Information was exposed to unauthorized actors.

596. All Defendants owed a duty to Plaintiffs and Class Members to: (a) provide data security consistent with industry standards and legal and regulatory requirements; and (b) ensure that VSI's systems and networks and the personnel responsible for them adequately protected Plaintiffs' and Class Members' Private Information.

597. Defendants had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting

commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

598. Pursuant to the FTC Act, Defendants had a duty to provide adequate systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

599. Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq*., Defendants had the further duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' PHI from unauthorized disclosure.

600. Pursuant to HIPAA, Defendants had a duty to implement reasonable data security measures for the PHI entrusted to them, including by, *e.g.*, rendering the electronic PHI it maintained in a form unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304.

601. Additionally, pursuant to HIPAA, Defendants had a duty to provide notice of the Data Breach within 60 days of discovering it. *See* 42 C.F.R. § 2.16(b); 45 C.F.R. § 164.404(b).

602. VSI breached its duties to Plaintiffs and Class Members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information, by failing to encrypt or timely delete the Private Information from its network systems, and by failing to timely or adequately notify or warn Plaintiffs and Class Members about the Data Breach.

131

603. PAI and SWC breached their duties to Plaintiffs and Class Members under the FTC Act and HIPAA by failing to ensure that VSI provides fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information, by failing to ensure that VSI encrypted or timely deleted the Private Information they provided VSI from its network systems, and by failing to timely or adequately notify or warn Plaintiffs and Class Members about the Data Breach.

604. Defendants' violations of the FTC Act and HIPAA as described herein directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiffs and Class Members.

605. Plaintiffs and Class Members are within the class of persons the FTC Act and HIPAA were intended to protect.

606. The type of harm that resulted from the Data Breach was the type of harm the FTC Act and HIPAA were intended to guard against.

607. Defendants' failure to comply with the FTC Act and HIPAA is negligence *per se.*

608. Defendants' duties to use reasonable care in protecting Plaintiffs' and Class Members' Private Information arose not only as a result of the statutes and regulations described above, but because Defendants are bound by industry standards to secure such Private Information.

609. VSI breached its duties and was negligent by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information from unauthorized

disclosure in the Data Breach. The specific negligent acts and omissions committed by VSI include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Failing to adequately train employees on proper cybersecurity protocols;

c. Failing to adequately monitor the security of its information technology networks and systems;

d. Failure to periodically ensure that its network systems had plans in place to maintain reasonable data security safeguards;

e. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information; and

f. Failing to timely notify Plaintiffs and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

610.    PAI and SWC breached their duties and were negligent by failing to ensure that VSI used reasonable measures to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure in the Data Breach. The specific negligent acts and omissions committed by PAI and SWC include, but are not limited to, the following:

a. Failing to take sufficient care in selecting a third-party vendor to host and manage Plaintiffs' and Class Members' Private Information;

b. Failing to audit and verify the integrity of VSI's data security practices;

133

c. Failing to demand that VSI encrypt data at rest and in transit or delete or redact data that it is no longer required to maintain;

d. Failing to ensure that VSI employed multi-factor authentication and limited access to sensitive data to only essential employees and for only the time necessary to complete specific duties; and

e. Failing to ensure that VSI had systems in place to detect unauthorized intrusions and the transfer of large volumes of data to external networks.

611. But for Defendants' wrongful and negligent breaches of their duties owed to Plaintiffs and Class Members, the Data Breach would not have occurred or at least would have been mitigated, Plaintiffs' and Class Members' Private Information would not have been compromised, and Plaintiffs' and Class Members' injuries would have been avoided.

612. It was foreseeable that Defendants' failures to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would injure Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable to Defendants given the known high frequency of cyber-attacks and data breaches in VSI's industry.

613. It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would cause them one or more types of injuries.

614. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time;

134

(e) loss of benefit of their bargain; and (f) the continued and certainly increased risk to their Private Information, which remains (i) unencrypted and available for unauthorized third parties to access and abuse; and (ii) in VSI's possession and subject to further unauthorized disclosures so long as VSI fails to undertake appropriate and adequate measures to protect it.

615.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will continue to suffer injuries and/or harm, including but not limited to anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

616.    Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Nationwide Class against all Defendants)**

617.    Plaintiffs re-allege and incorporate by reference paragraphs 1–570 above as if fully set forth herein and bring this claim against all Defendants.

618.    Defendants required Plaintiffs and Class Members to provide and entrust their Private Information to Defendants as a condition of obtaining services, benefits, and/or employment.

619.    When Plaintiffs and Class Members provided their Private Information to Defendants, they entered into implied contracts with Defendants. Pursuant to these contracts, Defendants agreed, as manifested through their conduct, to safeguard and protect

such Private Information and to timely and accurately notify Plaintiffs and Class Members if and when their Private Information was breached and compromised.

620. Specifically, Plaintiffs and Class Members entered into valid and enforceable implied contracts with Defendants when they agreed to provide their Private Information and/or payment to Defendants, and Defendants agreed to collect, maintain, and profit from that Private Information.

621. The valid and enforceable implied contracts that Plaintiffs and Class Members entered into with Defendants included Defendants' promises to protect Private Information they collected from Plaintiffs and Class Members against unauthorized disclosures. Plaintiffs and Class Members provided this Private Information in reliance on Defendants' promises.

622. Under the implied contracts, Defendants promised and were obligated to protect Plaintiffs' and Class Members' Private Information provided to obtain services, benefits, and/or employment. In exchange, Plaintiffs and Class Members agreed to provide Defendants with their Private Information.

623. Defendants promised and warranted to Plaintiffs and Class Members, through privacy documents and conduct, to maintain the privacy and confidentiality of the Private Information they collected from Plaintiffs and Class Members and to keep such information safeguarded against unauthorized access and disclosure.

624. Defendants' adequate protection of Plaintiffs' and Class Members' Private Information was a material aspect of these implied contracts with Defendants.

625. Defendants solicited and invited Plaintiffs and Class Members to provide their Private Information as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their Private Information to Defendants.

626. By entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that: (a) VSI's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act, HIPAA, and HITECH; and (b) that PAI and SWC would ensure any vendors and/or independent contractors they selected and utilized complied with industry standards and relevant laws and regulations, including the FTC Act, HIPAA, and HITECH.

627. Plaintiffs also reasonably believed that PAI and SWC would properly vet and inquire into the data security of any vendor and/or independent contractor it used—such as VSI— to ensure their Private Information was adequately protected and not susceptible to data breaches.

628. Plaintiffs and Class Members, who contracted with Defendants, provided their Private Information to Defendants and reasonably believed and expected that (a) VSI would employ adequate data security; and (b) PAI and SWC would utilize vendors and/or independent contractors with adequate data security to protect their Private Information. However, Defendants utterly failed to do so.

629. A meeting of the minds occurred when Plaintiffs and Class Members agreed to, and did, provide their Private Information to Defendants and agreed Defendants would

137

receive payment for and benefit from, amongst other things, the protection of their Private Information.

630.    VSI acknowledged its data privacy obligations as set forth in its online privacy policy.[66]

631.    Plaintiffs and Class Members performed their obligations under the contracts when they provided their Private Information and/or payment to Defendants.

632.    Defendants materially breached their contractual obligations to protect the Private Information they required Plaintiffs and Class Members to provide when that Private Information was unauthorizedly disclosed in the Data Breach due to: (a) VSI's inadequate data security measures and procedures; and (b) PAI and SWC's failure to ensure its vendors and/or independent contractors—such as VSI—had adequate data security measures and procedures in place.

633.    Defendants materially breached their contractual obligations to deal in good faith with Plaintiffs and Class Members when: (a) VSI failed to take adequate precautions to prevent the Data Breach; (b) SWC failed to ensure VSI took adequate precautions to prevent a data breach; and (c) Defendants failed to timely or adequately notify Plaintiffs and Class Members about the Data Breach.

634.    The Data Breach was a reasonably foreseeable consequence of Defendants' conduct, by acts of omission or commission, in breach of these implied contracts with Plaintiffs and Class Members.

---

[66] *See* ¶ 63, *supra.*

635. As a result of VSI's failure to fulfill the data security protections promised in these contracts and PAI and SWC's failure to utilize vendors and/or contractors with adequate data security protections, Plaintiffs and Class Members did not receive the full benefit of their bargains with Defendants and instead received services of a diminished value compared to that described in the implied contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they were promised and that which they received.

636. Had VSI disclosed that its data security procedures were inadequate or that it did not adhere to industry standards for cybersecurity, neither Plaintiffs, Class Members, nor any reasonable person would have contracted with VSI.

637. Similarly, had PAI and SWC disclosed that they would be using a vendor and/or independent contractor with inadequate data security or that it would not be vetting potential vendors and/or independent contractors to ensure they had adequate data security Plaintiffs, and the Class would not have contracted with SWC or PAI.

638. Plaintiffs and Class Members would not have provided and entrusted their Private Information to Defendants in the absence of the implied contracts between them and Defendants.

639. Plaintiffs and Class Members fully performed their obligations under their implied contracts with Defendants.

640. Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or restitution damages, in an amount to be proven at trial, due to Defendants' breach of implied contract.

## COUNT III
## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
## (On Behalf of Plaintiffs and the Nationwide Class against Defendant VSI)

641.    Plaintiffs re-allege and incorporate by reference paragraphs 1–570 above as if fully set forth herein and bring this claim against Defendant VSI.

642.    This Count is alleged in the alternative to Count II.

643.    VSI entered into uniform written contracts with its clients, including Plaintiffs' and Class Members' employers (such as SWC and PAI), to provide third-party benefit administration and data management services in connection with Plaintiffs' and Class Members' benefit plans.

644.    Pursuant these contracts, VSI received from its clients and maintained Plaintiffs' and Class Members' Private Information in the course of performing its contractual services, which it could not perform without receiving and maintaining such Private Information.

645.    Pursuant to these contracts, VSI's clients, including Plaintiffs' and Class Members' employers (such as SWC and PAI), agreed to provide VSI with compensation and Plaintiffs' and Class Members' Private Information.

646.    In exchange, VSI agreed, in part, to implement adequate data security measures to safeguard Plaintiffs' and Class Members' Private Information from unauthorized disclosure, and to timely notify Plaintiffs and Class Members of the Data Breach.

647.    VSI was required by statutes and regulations, including but not limited to the FTC Act, HIPAA, and state consumer privacy and protection laws, to have contracts with

140

its clients that required VSI to implement and maintain reasonable security procedures and practices to protect its clients' customers'—Plaintiffs and Class Members—Private Information from unauthorized access, use, or disclosure.

648.    The relevant statutes and regulations obligating VSI to promise by contract to use reasonable data security for Plaintiffs' and Class Members' Private Information create a class of intended beneficiaries whose members are implied into such agreements by operation of law. Plaintiffs and Class Members are the intended beneficiaries of the contracts that VSI entered into with Plaintiffs' and Class Members' benefit plans to satisfy these statutory and regulatory requirements.

649.    Upon information and belief, VSI's contracts with its clients each contained a provision requiring VSI to implement and maintain reasonable security procedures and practices appropriate to the nature of Private Information VSI collected, to protect the Private Information from unauthorized access, use, or disclosure.

650.    These contracts between VSI and its clients, including Plaintiffs' and Class Members' employers and/or health plans, were made expressly for the benefit of Plaintiffs and Class Members as the intended third-party beneficiaries of these contracts.

651.    VSI knew Plaintiffs and Class Members were involved and would benefit from the transactions that were subject to these contracts between VSI's clients and VSI.

652.    VSI knew that if it breached its contractual obligation to adequately safeguard Plaintiffs' and Class Members' Private Information, Plaintiffs and Class Members would be harmed.

653.    VSI breached these contracts with Plaintiffs' and Class Members' employers and/or health plans, by, among other acts and omissions: (a) failing to use reasonable data security measures, (b) failing to implement adequate protocols and employee training sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure, and (c) failing to promptly or adequately notify Plaintiffs and Class Members of the Data Breach.

654.    As a direct and proximate result of VSI's breaches of these contracts with its clients, Plaintiffs and Class Members have suffered and will continue to suffer injuries as set forth herein and are entitled to damages sufficient to compensate for the losses they sustained.

**COUNT IV**
**UNJUST ENRICHMENT**
**a(On Behalf of Plaintiffs and the Nationwide Class against all Defendants)**

655.    Plaintiffs re-allege and incorporate by reference paragraphs 1–570 above as if fully set forth herein and bring this claim against all Defendants.

656.    Plaintiffs plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein, to the extent Plaintiffs and Class Members may not have an adequate remedy at law against Defendants.

657.    Plaintiffs and Class Members conferred a monetary benefit on Defendants. Specifically, they provided their Private Information to Defendants. In exchange, Plaintiffs and Class Members should have had their Private Information protected with adequate data security. Without the collection and receipt of Plaintiffs' and the Class's Private

Information, Defendants would not be able to provide services and would be unable to obtain revenue.

658.   Defendants knew Plaintiffs and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the Private Information entrusted to them, and indeed, generating revenue from doing so. Defendants profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

659.   Defendants failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

660.   Defendants acquired the Private Information through inequitable means as they failed to investigate and/or disclose the inadequate data security practices as alleged herein.

661.   VSI enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information.

662.   PAI and SWC enriched themselves by saving the costs they reasonably should have expended on a vendor and/or independent contractor with adequate data security measures to secure Plaintiffs' and Class Members' Personal Information

663.   Instead of VSI providing a reasonable level of data security that would have prevented the Data Breach, and PAI and SWC utilizing a vendor and/or independent contractor with a reasonable level of data security that would have prevented the Data Breach, Defendants calculated to increase their own profits at the expense of Plaintiffs and

143

Class Members by utilizing cheaper, ineffective security measures and vendors and/or independent contractors and diverting those funds to their own pockets. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decisions to prioritize their own profits over the requisite security of customers' Private Information.

664.    Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

665.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injuries and damages as set forth herein.

666.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

**COUNT V**
**DECLARATORY JUDGMENT**
**(On behalf of Plaintiffs and the Nationwide Class against all Defendants)**

667.    Plaintiffs re-allege and incorporate by reference paragraphs 1–570 above as if fully set forth herein and bring this claim against all Defendants.

668.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary supplemental relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

144

669.    In the fallout of the Data Breach, a controversy has arisen about: (a) VSI's duties to use reasonable data security for the Private Information it collects and maintains; and (b) PAI's and SWC's duties to use vendors and/or independent contractors with reasonable data security for the Private Information they collect and maintain.

670.    On information and belief, Defendants' actions were—and still are—inadequate and unreasonable. Plaintiffs and Class Members continue to suffer injuries from the ongoing threat of fraud and identity theft due to VSI's inadequate data security measures and PAI's and SWC's failure to use vendors and/or independent contractors with adequate data security measures.

671.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring as follows:

   a. VSI owed—and continues to owe—a legal duty to use reasonable data security to secure the Private Information entrusted to it;

   b. PAI and SWC owed—and continue to owe—a legal duty to ensure any vendors and/or contractors they hire use reasonable data security to secure the Private Information entrusted to them;

   c. Defendants have a duty to notify impacted individuals of the Data Breach under common law, Section 5 of the FTC Act, and HIPAA;

   d. VSI breached, and continues to breach, its duties by failing to use reasonable measures to protect the Private Information entrusted to it from unauthorized access, use, and disclosure

e.  PAI and SWC breached, and continue to breach, their duties by failing to ensure the vendors and/or contractors it utilizes deploy adequate data security and/or by willingly using vendors and/or contractors who fail to use reasonable measures to protect the Private Information; and

f.  Defendants' breaches of their duties caused—and continue to cause—injuries to Plaintiffs and Class Members.

672.  The Court should also issue injunctive relief requiring VSI to use adequate data security consistent with industry standards and PAI and SWC to use vendors and/or independent contractors with adequate security consistent with industry standards.

673.  If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injuries and lack an adequate legal remedy if a second data breach occurs. And if a second breach occurs, Plaintiffs and Class Members will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full, and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted for out-of-pocket damages and other legally quantifiable and provable damages, cannot cover the full extent of Plaintiffs' and Class Members' injuries.

674.  If an injunction is not issued, the resulting hardship for Plaintiffs and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

675.  An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

**COUNT VI**

**NEGLIGENT SELECTION, HIRING, OR RETENTION**
**(On behalf of Plaintiffs and the Nationwide Class against PAI and SWC)**

676. Plaintiffs re-allege and incorporate by reference paragraphs 1–570 above as if fully set forth herein and bring this claim against SWC.

677. Texas recognizes a cause of action for negligently hiring an independent contractor.

678. PAI and SWC may be held responsible for VSI's negligent acts if: (a) PAI and SWC knew or should have known that VSI was incompetent; and (b) a third person was injured because of the VSI's incompetence.

679. At all relevant times, VSI was Defendants' independent contractor. PAI and SWC allowed VSI access to the Private Information of Plaintiffs and the Class without: (a) vetting VSI and inquiring about its data security qualifications; (b) inquiring about and/or investigating VSI's data security procedures, protocols, and infrastructure; (c) ensuring VSI had data security systems and procedures compliant with HIPAA, the FTC Act, and recognized industry standards; (d) ensuring VSI adequately secured and protected Private Information in its possession from data breaches; and/or (e) advising VSI of the confidential nature of Plaintiffs' and the Class's Private Information and its duty to protect that information.

680. If SWC would have inquired into the adequacy of VSI's data security prior to selecting, retaining, and hiring VSI, SWC would have known VSI was incompetent and incapable of adequately protecting and securing Plaintiffs' and the Class's Private Information. Reason being, PAI and SWC would have discovered VSI *did not* have data

147

security measures in place that were compliant with HIPAA, the FTC Act, and recognized industry standards. Under these circumstances, SWC knew or should have known that VSI was incompetent.

681.    However, PAI and SWC were negligent and failed to exercise the requisite standard of care in the hiring, selecting, and retaining VSI. As a result, a well-known cybercriminal group—BlackSuit—accessed and stole Plaintiffs' and the Class's Private Information and caused the damages delineated herein by virtue of the Data Breach.

682.    PAI and SWC owed a duty to Plaintiffs and the Class to ensure VSI had adequate data security, procedures, and protocols sufficient to protect Plaintiffs' and the Class's Private Information from data breaches prior to hiring VSI.

683.    PAI and SWC also owed a continuing duty to Plaintiffs and the Class to ensure VSI continued to employ adequate data security, procedures, and protocols sufficient to protect Plaintiffs' and the Class's Private Information from data breaches after hiring VSI.

684.    PAI and SWC breached these duties by failing to ensure VSI possessed the requisite data security, procedures, practices, infrastructure, and protocols to protect Plaintiffs' and the Class's Private Information from data breaches prior to hiring VSI and while VSI worked for PAI and SWC.

685.    Additionally, PAI and SWC breached their duties and obligations by: (a) failing to ensure VSI designed, implemented, monitored, and maintained reasonable network safeguards against foreseeable threats; (b) failing to ensure VSI designed, implemented, and maintained reasonable data retention policies; (c) failing to ensure VSI

adequately trained or oversaw its employees regarding data security; (d) failing to ensure VSI complied with industry standard data security practices; (e) failing to ensure VSI encrypted or adequately encrypted the Private Information that was stored on VSI's network; (f) failing to ensure VSI had systems or processes in place to recognize or detect that VSI's network had been compromised and accessed; (g) failing to ensure VSI utilized widely available software able to detect and prevent data breaches; and (h) failing to ensure VSI otherwise adequately secured the Private Information of Plaintiffs and the Class using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

686. PAI and SWC were on notice of the importance of data security because of well-publicized data breaches occurring throughout the United States. Despite knowledge of prior data breaches, PAI and SWC failed to ensure VSI possessed the requisite data security posture to protect Plaintiffs' and the Class's Private Information from unauthorized disclosure.

687. PAI and SWC knew or should have known that the failure to ensure VSI employed adequate data security, procedures, and protocols would create an unreasonable risk of danger to persons and property.

688. As a direct and proximate result of PAI's and SWC's breach of their duties, and their negligent hiring, retention, and selection of VSI, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, loss of privacy, diminution in value of their Private Information, and actual misuse of their Private Information.

689.   PAI and SWC was advised of the Data Breach, but continued to employ VSI, putting Plaintiffs and the Class at risk of more data breaches in the future.

690.   The acts and omissions of PAI and SWC in negligently hiring, retaining, and/or selecting VSI are such as to show gross negligence and reckless disregard for the safety of others and, therefore, punitive damages are appropriate.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment as follows:

A.      An Order certifying this case as a class action on behalf of Plaintiffs and the proposed Classes, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Classes;

B.      Awarding Plaintiffs and the Classes damages that include applicable compensatory, actual, statutory, nominal, exemplary, and punitive damages, as allowed by law;

C.      Awarding restitution and damages to Plaintiffs and the Classes in an amount to be determined at trial;

D.      Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Classes;

E.      Awarding injunctive relief in the form of additional technical and administrative cybersecurity controls as is necessary to protect the interests of Plaintiffs and the Classes;

F.    Enjoining Defendants from further deceptive practices and making untrue statements about their data security, the Data Breach, and the transmitted Private Information;

G.    Awarding attorneys' fees and costs, as allowed by law.

H.    Awarding prejudgment and post-judgment interest, as provided by law; and

I.    Awarding such further relief to which Plaintiffs and the Classes are entitled.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues to triable.

Date:  July 3, 2025

Respectfully submitted,

*/s/ William B. Federman*
William B. Federman
Tex. Bar No. 00794935
**FEDERMAN & SHERWOOD**
4131 N. Central Expressway
Suite 900
Dallas, Texas 75204
Telephone: (800)-237-1277
Email: wbf@federmanlaw.com

Jeff Ostrow (admitted *pro hac vice*)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Fax: (954) 525-4300
Email: ostrow@kolawyers.com

John J. Nelson (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: (858) 209-6941
Email: jnelson@milberg.com

151

*Interim Co-Lead Class Counsel*